# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **RICKY DANELL LOCKHART,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **VS.** | ) | **Civil Action No.   SA-18-CA-766-XR** |
| | ) | |
| **REPUBLIC SERVICES, INC., et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

On this date, the Court considered the Motion for Summary Judgment filed by Defendants. After careful consideration, the Court grants summary judgment for Defendant on all claims.

## Background

Plaintiff Ricky Danell Lockhart brings this lawsuit against Defendants Republic Services, Inc. ("Republic"), BFI Waste Services of Texas, LP d/b/a Allied Waste Services of San Antonio/Republic Services of San Antonio ("Republic of San Antonio"), Republic Waste Services of Texas, Ltd. ("Republic of Texas"), Allied Waste Systems, Inc. ("Allied"), Kenneth "Kenny" Ramzinski, and Ryan Whiteside alleging race-based employment discrimination and retaliation in violation of Title VII and § 1981, and unpaid overtime and retaliation in violation of the Fair Labor Standards Act ("FLSA"). Docket no. 30.[1]

Plaintiff worked as a driver operating a waste collection truck in the industrial line of

---

1 At the initial status conference, the Court granted in part Defendants' motion to dismiss and dismissed Plaintiff's religion and sex discrimination claims and his claims against the individual defendants under Title VII.

business for Republic of San Antonio.[2] Plaintiff was offered the position of Roll Off Driver on June 11, 2012.[3] Def. Ex. E. It is undisputed that Plaintiff was paid on a piece rate basis, also referred to as "can pay," which was calculated by multiplying Plaintiff's personal can rate by the haul's can value. Def. Ex. D (Ramzinski Decl.). Plaintiff's personal can rate was based on his skill and experience, and began at $14.50. *Id.* The can value was based on its location, distance to the landfill, and difficulty in extracting the can; can values were the same for all drivers. *Id.*; Whiteside depo. at 16, 68 (amount of drive time to location is factored into the container value). Plaintiff made multiple hauls per day and, at the end of each work day, he completed a route sheet listing the hauls he made that day and the can values for those hauls. Def. Ex. D (Ramzinski Decl.). Drivers also clocked in and out, and at the end of a week, the driver's can rate multiplied by the total can values was divided by the total number of hours worked on the clock to determine the driver's regular rate of pay. Drivers were paid this regular rate for all hours worked, and "co-efficient overtime" was paid by awarding an additional .5 times the calculated regular rate to all hours worked over forty. It is undisputed that Plaintiff regularly worked more than forty hours a week on the clock. Whiteside depo. at 18.

In 2015, Plaintiff began complaining that his personal can rate was too low. Pl. depo. at 54. He testified that he was getting $14.50 per can and he heard that other drivers with less seniority were getting more. *Id.* He complained to Modesto Dominguez, the Division Manager at the time,

---

2 There is a dispute about who actually was Plaintiff's employer for purposes of liability, but it is undisputed that Plaintiff worked for Republic of San Antonio. Given that the Court is granting summary judgment on all claims, it need not decide if the other defendants qualify as employers for liability purposes.

3 Plaintiff contends, and Defendants do not dispute, that Plaintiff had been employed "by one or more of the Defendants" for close to twenty years. Docket no. 30 (Am. Compl.) ¶ 2. Plaintiff further asserts that he was recognized numerous times over his many years with the company for the excellence of his work and was awarded for excellence and safety in 2012, 2013, 2014, 2015, and 2016. *Id.* ¶¶ 26-27; *see also* Pl. Ex. 10 (Lockhart Decl.) (verifying contents of Amended Complaint as true). Plaintiff testified that he began working for BFI in Arkansas in 1999 and then moved to San Antonio in 2012 to be a roll-off driver. Pl. depo. at 47-48.

and received a raise in his can rate from $14.50 to $17.60. *Id.* at 55; Whiteside depo. at 64-65.

At the time of the relevant events in question (2016 to 2017), Plaintiff's direct supervisors were Albert Ruelas and Rick Henderson, who were in turn supervised by Operations Manager Kenneth "Kenny" Ramzinski. Ryan Whiteside was the General Manager, who supervised Ramzinski and others. Def. Ex. N; Whiteside depo. at 8-9, 98. Ramzinski started working at Republic of San Antonio in August 2015 and Whiteside in August 2016. Ramzinski depo. at 40; Whiteside depo. at 58.

In accordance with Department of Transportation (DOT) requirements, Plaintiff and all drivers were required to take a daily thirty-minute lunch break if driving for more than eight hours. Plaintiff signed a "Driver Meal Period Acknowledgement" stating that the Company's policy is to require all non-exempt employees, including drivers, to take an uninterrupted meal period of at least 30 minutes per day. Def. Ex. F. The acknowledgment states, "This meal period is not optional. No employee may refuse to take the mandatory meal period. The meal period should be taken during your workday and not at the end of your workday." *Id.* The vehicle must be parked, the meal period must be no less than 30 minutes, the driver is relieved from responsibility for the vehicle, and the driver may leave the premises to pursue activities of their choosing, and if the meal period meets these four conditions, it should be recorded on the log as "off duty," not "on-duty not driving." *Id.* By signing, which Lockhart did, he "agree[d] to abide by these rules and procedures and to take all steps necessary to ensure that your mandatory meal period qualifies as Off-Duty time." *Id.*; Pl. depo. at 50-51, 59. Plaintiff testified that he recorded 30-minute meal breaks on his route sheets when he did not actually take them. Ramzinski states that Plaintiff "never told me that he was working through lunch or that he falsified his route sheets to indicate he

took a lunch break when he did not." Def. Ex. D (Ramzinski Decl.).[4] Whiteside also testified that

he did not know drivers were not taking required lunch breaks. Whiteside depo. at 100. During

Plaintiff's employment, there were no GPS devices on the trucks. *Id.* at 96.

      In 2016, Plaintiff was selected by Whiteside to participate in the 2017 National ROAD-EO,

a competition held in Phoenix for forty waste disposal drivers from around the country. Whiteside

selected Lockhart because he "liked Ricky and wanted him to go represent us" and he

"exemplified the best of the drivers in [the] San Antonio division." Whiteside depo. at 12; *id.* at 28

("Ricky was a very good skilled driver and he represented the best chance for a driver to win at the

event."). Plaintiff attended the ROAD-EO in early March 2017. Docket no. 30 ¶ 29. While there,

he complained to District Manager Al Beasley[5] that he was not being paid correctly. *Id.* ¶ 32.

Plaintiff complained that certain container boxes were not being defined as dump and return, but as

a swap, which paid less than a dump and return. Pl. depo. at 175. He testified that a swap is when

you exchange the container, and when you get to the landfill, it is complete, whereas a dump and

return requires the driver to bring the customer's box back. Pl. depo. at 111.

      Whiteside testified that, when they got back to San Antonio, he asked Plaintiff to explain

what his issues were with the pay plan, and his understanding of the issue from that conversation

---

4 The record indicates that Plaintiff received a counseling form on May 2, 2017 stating, "Rick, this coaching is in regards to lunch break being noted on the route sheet. On 5/2/2017 you failed to note lunch on the route sheet. Moving forward please note lunch on the route sheet." Def. Ex. H. He received the same form for failing to note his lunch on May 4, 2017. *Id.* This counseling was for failing to note lunch on the sheet, not for noting lunch when he had not taken lunch.

5 The Complaint states Plaintiff complained to Al Beasley, and Plaintiff testified he talked to Al Beasley. Pl. depo. at 117. During Plaintiff's deposition, defense counsel stated for the record that they believe it was "Mr. Blease." Pl. depo. at 174; *see also* Whiteside depo. (agreeing his name is actually Blease). Plaintiff's Ex. 8 states that Plaintiff complained to Area President Bill Boyer, citing Whiteside's deposition at 13-14. But Whiteside testified that he "did not ever hear [Plaintiff] talk to the district operations manager, no," and he did not know to whom Plaintiff spoke. Whiteside depo. at 13-14, 63. But Whiteside did know that Brain Boyer, the area president at the time, mentioned to him while they were still in Arizona that Plaintiff "brought up some pay issues" and asked him to "talk with [Plaintiff] about it." Whiteside depo. at 13-14. Whiteside told Lockhart he would talk to him about it when they got back to San Antonio. Whiteside depo. at 14-15.

was that Plaintiff "felt he could be more productive on swaps and dumps and returns if he was allowed to make that decision," specifically whether he's going to swap containers versus doing a dump and return (taking a container to the landfill and then returning it to the customer). Whiteside depo. at 15. Whiteside agreed that a swap pays less than a dump and return. *Id.* Plaintiff also testified that, about a week after he returned from ROAD-EO, he was called into Whiteside's office and asked why he didn't tell Whiteside he had problems with his box pay. Pl. depo. at 117. Plaintiff told him he'd been going to Rueles "over and over about the box pay" and Whiteside said he would look into it. Pl. depo. at 117.

Plaintiff alleges that, after making the complaints at the ROAD-EO competition, he suffered a series of retaliatory actions, culminating in his termination. He alleges that, before he complained to Beasley, he "had never received any written discipline or counselings other than a couple of minor matters, which did not result in any suspension or loss of pay." Am. Compl. ¶ 68.

Defendant has a progressive disciplinary plan as follows: verbal warning (should be confirmed in writing using the Corrective Action Form), first written warning (a second violation within 12 months of the verbal written warning or any preventable incident), second written warning/suspension (violation within 12 months of first written warning, results in 3-day suspension without pay), and then termination. Def. Ex. D (Ramzinski Decl.); Def. Ex. D-4 (plan). The Corrective Action Form has four boxes that can be checked in the "Details" section, for verbal, written, suspension, and termination. Counseling/coaching/teaching forms were also used apart from the corrective action and progressive discipline process. Whiteside depo. at 113.

Plaintiff disagreed with the can value being assigned to certain hauls and recorded a higher value than the assigned value on his route sheet at the end of the day. He received counseling from

5

Ramzinski on how to properly record his can pay in April 2017. Def. Ex. H (Employee Counseling Form dated April 5, 2017 stating, "Ricky, We have talked to you about putting the right container pay on the route sheet and putting comments on the route sheet. You need to correct this behavior as soon as possible. Moving forward you will be responsible to put the right grid pay on your route sheet. If this behavior continues we will follow disciplinary action."); Pl. depo. at 101-02. The counseling sheet states "Employee refused to sign – witness signature" with an illegible signature and "discussed with Ricky L on 4.13.17."

Plaintiff refused to sign because he felt they were not paying him correctly. Pl. depo. at 102. Plaintiff testified that they had been paying can values correctly in 2013, but he felt it changed sometimes in 2015 or 2016. Pl. depo. at 122-23. He testified that he did not understand how to correctly record the can values as Ramzinski wanted because he felt he was recording them correctly. Pl. depo. at 122-24. Whiteside testified that he remembered talking to Plaintiff about this and telling him, I got your feedback. I'm working on it. That doesn't mean the pay plan's changed." Whiteside depo. at 120. Whiteside testified it was creating extra administrative work for people and "we're aware of your feelings on the pay plan, but that doesn't change the pay plan." *Id.* at 121. Ramzinski also testified that he told Plaintiff that although there was a possibility of changing the plan, until then, he had to follow the approved plan." Ramzinski depo. at 61. Ramzinski felt Plaintiff "was making a conscious decision not to follow it." *Id.* Ramzinski thought there was no gray area because the can values were set out on the sheet given to drivers. *Id.* at 62.

Plaintiff received a documented verbal warning for insubordination and failure to follow instructions for failing to correctly record his can pay on April 14, 2017. Def. Ex. G. The box "verbal" is checked on the form. *Id.* The description of the issue was, "Ricky, you continue to put

the wrong container pay on your route sheet. This is consider[ed] insubordination." It was signed by Plaintiff's supervisor (name unknown, perhaps Albert Ruelas), as well as Ramzinski and Whiteside as "approval signatures." *Id.*[6] It states Plaintiff refused to sign. *Id.* Plaintiff testified that he understood Ramzinski was writing him up because he refused to follow the instructions given on April 5. Pl. depo. at 104.

Plaintiff testified, "We never had this problem until I came from the Roadeo and then they were calling me in there saying I wasn't putting the right container." Pl. depo. at 105. Plaintiff testified that in April, he put zero on his route sheet a few times because he knew Rueles would change it anyway, but he kept his own records. *Id.* at 105-08. Plaintiff would put 2.25 for a container he deemed a dump and return and someone, he assumed Rueles, changed it to 1.75 (for a swap). *Id.* at 110. He testified he had been putting the same thing since before Roadeo (and it was being changed) but he only started getting write-ups after Roadeo. *Id.* at 110, 113. He testified he told Ramzinski he would put zeros so he would not keep getting in trouble, and Rueles would change it, and Ramzinski said that was fine and "they didn't visit me no more about it." *Id.*  at 109, 124. He also testified he did not get written up for this issue once they started paying him "correctly" in May. *Id.* at 106, 113.

On April 19, Ruelas emailed Ramzinski and Henderson that he "spoke to Ricky and he refused to sign the corrective action form. He will more than likely go see you or [Whiteside] but he still continues to do it wrong and refuses to correct the behavior." Pl. Ex. 9. Ramzinski forwarded the email to Whiteside, saying "He (Ricky) may come and talk to you today and I wanted you to know why. Ricky continues to incorrectly fill out his can pay causing the

---

6 Plaintiff contends that both Ramzinski and Ryan Whiteside issued the disciplinary Corrective Action Forms to Plaintiff. Docket no. 45-1.

supervisors to have to correct it daily. We have coached him (he refused to sign) and now this is a documented verbal warning (he refused to sign). His next occurrence will be a 1st written warning." *Id.* There are additional counseling forms for this issue dated April 21 and April 25, 2017. Def. Ex. H. Plaintiff testified he did not recall the counseling on April 21 and April 25, but he did not deny receiving it. Pl. depo. at 128, 130-31.

On April 20, Whiteside emailed Emilie Garcia in HR that "Ricky is planning on filing a harassment claim saying that he is being singled out and that all drivers are not be [sic] talked to." Pl. Ex. 9. Garcia responded to Ramzinski asking him to "provide the names of other drivers that have had the same issue" and to provide the Corrective Action Form. Pl. Ex. 9. On May 4, 2017, Garcia emailed Ramzinski, "Can you set up a time and meeting with Ricky to explain the pay plan to him. He 'Officially States' he does not understand why he is being written up since he is entering what he believes to be right. I stated to him that please follow our approved pay plan and he said he is and if he messes up it's not his fault." Pl. Ex. 9.

Sometime in May 2017, Defendant implemented a new pay plan to address Plaintiff's concerns. Whiteside thought Plaintiff had "a good idea" and "feedback on how to improve for both the company and the driver," and so they "implemented his idea on letting Ricky decide whether or not it was a swap or a dump and return." Whiteside depo. at 20, 29; *see also id.* at 107-08 (Whiteside submitted the new pay plan for approval and received it). Whiteside agreed that a driver should be able to choose in the field how to be productive and decide whether to do a dump and return or a swap. *Id.* at 121. Whiteside felt that the change was "mutually beneficial" because it "rewarded drivers that also rewarded the company" and "[t]hat's why we switched to it." *Id.* at 161. Ramzinski also testified that he thought it "was a great point." Ramzinski depo. at 18. After

the change, Plaintiff was "real happy." Pl. depo. at 117 ("Q: So they changed the rate that you got

for those trips? A: Right. Q: And you were happy at that point?" A: Oh, yes, ma'am, real happy.").

There was no pay adjustment to any back pay based on the new plan, and Whiteside testified that

prior discipline related to the pay issue was not rescinded because Plaintiff had been breaking the

policy in place at the time. Whiteside depo. at 162.

      Plaintiff received another corrective action on June 7, 2017 for "equipment abuse." Def.

Ex. I. Although this was Plaintiff's second corrective action form, the box "verbal" is checked and

not the box "written." *Id.* Hilda Juarez, the maintenance supervisor, states that Plaintiff's truck had

consistent issues with its "regen" (short for regeneration) system, and they sent the truck to an

outside vendor to diagnosis the problem on May 31. Def. Ex. J (Juarez Decl.). Regen is the process

by which a diesel truck's diesel particulate filter cleans itself of buildup, and inhibiting this

function too many times can cause damage to the truck. Def. Ex. D (Ramzinski Decl.). Juarez

states she did not know it was Plaintiff's truck when she sent it to the outside vendor. Def. Ex. J.

The third-party maintenance shop reported that the button inhibiting the regen process had been

pressed over 40 times. Def. Ex. D (Ramzinski Decl.); Def. Ex. J (Juarez Decl.) ("The vendor

reported that the regen function was bypassed over 40 times."). Defendants contend this caused

over $4000 worth of damage to the truck. Def. Ex. I (estimate for $4,133.00).

      Plaintiff denied ever bypassing the regen function and went to Ramzinski to discuss it, Pl.

depo. at 26-27, 137-38[7], but Ramzinski determined that Plaintiff was responsible because the truck

was Plaintiff's assigned truck and he had missed only five days of work in the eleven weeks

---

7 Ramzinski testified that you should never hit the bypass button and the expectation and training was that you pull over and do a park regen immediately to allow the truck to go through the process when it needs to. Ramzinski depo. at 36. Plaintiff testified that before the truck was sent for maintenance, he recalled regenning it only once, and the process took about 30 minutes. He testified that the indicator light for the regen process had not come on any other time. After the truck was returned from Peterbilt, he testified he regenned it every day or every other day. Pl. depo. at 141.

leading up to the diagnosis, and thus it was impossible for anyone else to have been responsible. *Id.* Whiteside testified that the inhibit button can only be pushed a certain number of times (he believed two) per day, and at "the very least it had been over 20 different days of pushing that button." Whiteside depo. at 25, 32; Ramzinski depo. at 35 (stating that the most it can be hit is twice per day and if you hit it a third time the truck will have to be towed). Ramzinski testified that Plaintiff would have been in his assigned truck 97% of the time. Ramzinski depo. at 37. Whiteside admitted that Plaintiff denied pushing the button, but felt that the fact that (1) it was Plaintiff's truck; (2) Plaintiff would not have had enough days off for someone else to drive his truck and push the button that many times; and (3) no other trucks had this same problem, indicated Plaintiff was the one who pushed it, even though he denied it. Whiteside depo. at 25-27, 30. Whiteside did not do any independent investigation. Whiteside depo. at 30. Plaintiff refused to sign the corrective action form. It was signed by Plaintiff's supervisor (name unknown), as well as Ramzinski and Whiteside as next level manager approval signatures. Def. Ex. I; Whiteside depo. at 31, 142.[8]

Ramzinski also disciplined Plaintiff by issuing a corrective action on September 6, 2017 for an incident on September 5, 2017. Def. Ex. L. The corrective action form states it is for "failure to follow instructions," "failure to wear personal safety equipment," and "insubordination." *Id.* Plaintiff refused to sign the form, but it signed by his supervisor and Ramzinski and Whiteside as next level managers. *Id.* Defendants contend that Plaintiff was insubordinate to Hilda Juarez. Juarez states that on September 5, Lockhart went onto the floor of the maintenance shop to visit with a mechanic, and she instructed Lockhart not to talk to him because he was on the clock and to write down any concerns about his truck on his vehicle condition report or talk to a supervisor

---

8 The record indicates that Plaintiff agreed to maintain his vehicle to standards and that he could be subject to corrective action up to an including termination for failing to maintain and keep clean his vehicle. Def. Ex. K.

instead. Def. Ex. J (Juarez Decl.). Juarez states Plaintiff exited the maintenance shop with Juarez, but then went around the building and approached the mechanic again, in an area where personal protective equipment (PPE) is required. *Id.* Juarez states that, as she started to approach Lockhart again, he walked away to avoid her, but she caught up to him to remind him of her previous instruction and to note that he should have been wearing PPE in that area. *Id.* Juarez states, "Mr. Lockhart would not make eye contact with me and we had a dispute over whether he was required to wear PPE. Mr. Lockhart was insubordinate and refused to follow my directions." *Id.* Juarez "reported Mr. Lockhart's insubordination to Mr. Ramzinski." *Id.* Juarez believed that Lockhart was disrespectful to her because she was a woman; she said he would not look at or talk to her and would only engage with her male supervisor at times. *Id.* According to Ramzinski, Juarez came to him and verbally complained to him that Plaintiff was distracting a mechanic while he was on the clock, was present in a maintenance area without wearing PPE, and was insubordinate, disobeying her direct orders. Def. Ex. D (Ramzinski Decl.); Ramzinski depo. at 33.

Juarez states that, at the time of this incident, she was "completely unaware that Mr. Lockhart had made any complaint to anyone at RS of San Antonio about his pay. I was not made aware of his complaints until the last three or four months when someone told me that Mr. Lockhart filed a lawsuit about his pay. I do not know the details about what his complaints are in this lawsuit." *Id.*; *see also* Def. Ex. D (Ramzinski Decl.) ("To the best of my knowledge, Ms. Juarez was unaware that Mr. Lockhart made complaints to anyone at RS of San Antonio about his pay."). Plaintiff presents the testimony of Juan Puga, a prior junior-level supervisor, that Juarez must have heard about the pay complaints because she attended management meetings with other junior level supervisors and "we all knew that there was an issue with him." Puga depo. at 115.

11

Puga testified that before Plaintiff even got back from ROAD-EO, his "name came up" and they said "we have an issue with a driver." Puga depo. at 75. Puga testified that "whenever there was a problem, it was considered – it was called an issue. So whenever [someone says there an 'issue' with a given employee] that means try to fire him, find a way to fire him." *Id*. at 27. He also testified that "Kenny [Ramzinski] was the one that brought up the meeting that we had an issue with – with Lockhart we had to deal with it" but he could not recall when that meeting was. *Id*. at 82. Whiteside testified that Plaintiff's pay issues were not discussed in those management meetings and Juarez would never have heard of the fact that Plaintiff was complaining about pay issues. Whiteside depo. at 38.

According to Plaintiff, he did not initially go into the shop or pull the mechanic away from his work; instead, Plaintiff says, the mechanic came to pick up the vehicle condition report, and Plaintiff asked him about his truck, and the mechanic showed him where to look for a cable on his truck. Pl. depo. at 28.[9] About this time, Juarez came up and told him not to talk to her drivers, and he "shook [his] head and just walked off." *Id*. at 29. Plaintiff admits approaching the mechanic again after that. Plaintiff stated he had given the mechanic an envelope three days before for a church fundraiser and the mechanic had said he would put some money it and give it back to him. *Id.* Plaintiff states that the mechanic "showed [him] an envelope" and he "thought he was showing [him] an envelope that he had put some money in there," so he "did go on the outside of the shop and was going to get the inform from" the mechanic, but he was not there so he walked back. *Id.* Plaintiff denies being in area where PPE was required. *Id*. at 148. Plaintiff states, "By the time I walked back Hilary [Hilda Juarez] almost in a run, trot over there and said, I told you don't talk to

---

9  Whiteside testified that he was not sure if Plaintiff pulled the mechanic off the shop floor, and that "Hilda's account to me is that she walked up on Ricky asking personal questions about his personal vehicle to her technician who was on the clock trying to work on his [vehicle condition report]." Whiteside depo. at 35.

12

my driver about your personal truck or your vehicle, your work truck, rather. And so I looked at her again and just turned, no words, nothing, just turned and walked off." *Id.* at 29.

Plaintiff went to work the next day and at the end of the day, Ramzinski called him in his office. Juarez was there and Plaintiff denied her statement that he came through the shop and pulled the driver off work and explained that he thought the mechanic had an envelope for him when he went back, but Juarez "went off" because he kept saying her name incorrectly. *Id.* at 30. Plaintiff denied confronting her, that he disliked her because she was a lady, or acting in an inappropriate way to Juarez. *Id.* Plaintiff wanted Ramzinski to review video footage to prove that he did not pull the mechanic off the job, but Ramzinski did not do so. *Id.* at 43. Plaintiff did not think Ramzinski believed that he disrespected Juarez because she was a woman, but he disciplined Plaintiff anyway. *Id.* at 31. Ramzinski testified that all three issues (being on the floor when he's off the clock, not wearing PPE, and arguing with a manager) were all "pretty egregious" violations. Ramzinski depo. at 69. Plaintiff received a three-day suspension for this infraction. Def. Ex. L. The box "suspension" is checked on the form. *Id.* Juarez disciplined the mechanic for the incident.

On November 17, 2017, Plaintiff and two other drivers entered the landfill through a side gate. The landfill is owned by a Republic entity, but is a separate operation from Plaintiff's workplace. The front entrance was subject to delays caused by an accident, so Plaintiff went to the exit gate to explore whether he could use that gate to enter. Am. Compl. ¶ 62. Plaintiff alleges that "Garci LNU, the Gate Supervisor, at the landfill, gave Lockhart permission to enter that gate under the circumstances." *Id.*; Pl. depo. at 156.[10] In his deposition, Plaintiff states that "Garcia" told him

---

[10] Whiteside testified that there is no gate supervisor at the landfill, only a scale house supervisor, who is not at the gate. Whiteside depo. at 75.

he was not supposed to go through the gate, and Plaintiff offered to turn around, but Garcia then told him to go ahead. Pl. depo. at 156. Plaintiff thought "Garci" or "Garcia" [later determined to be Daniel Garza] was the landfill supervisor in charge. Pl. depo. at 163. In his Declaration, Plaintiff states that, on the day of the incident, he came across "a Republic landfill supervisor named Garcia at the gate, who told me I could go through this one time even though I was willing to turn my truck around if he thought it was going to be a problem." Pl. Ex. 10 (Lockhart Decl.). Although Defendants assert that the gate was clearly marked "exit only," Plaintiff denies that it was so marked. Pl. depo. at 150-51. Plaintiff took a picture of the sign on May 29, 2018 which does not say, "exit only," but says "site entrance location" at a different address. Pl. depo. at 152. According to Plaintiff, he was never told not to use that gate and he knows it had been used on other occasions by other drivers when the line was backed up at the main entrance. Pl. Ex. 10 (Lockhart Decl.).

Plaintiff produced a handwritten and signed statement from landfill worker Daniel Garza wherein he states that, upon coming across Lockhart coming into the landfill from that gate, "I stop the driver and it was Ricky . . . I asked him that he cannot be doing that because it's only an exit. His response to me was that, because there was an accident on the highway and cars were so back up. So I went ahead and called the scale house to let them know that Rick came through the back gate and he is going to the scale to weigh in before he can dump the load. Then I called my boss Frank to let him know." Pl. Ex. 7 (Garza Handwritten Statement).

Ramzinski states he learned of this incident through an email from the landfill operations manager, Frank Franco. Def. Ex. D (Ramzinski Decl.); Def. Ex. D-5 (email). The email from Franco states, "On Friday 17, 2017 at 1:08pm I received a call from Daniel Garza stating that Ricky Lockhart had come in through the back gate and its [sic] not allowed by permit it is a

14

temporary authorization for EXIT ONLY and is not permitted by [our] permit. If this continues we will lose the privilege of using the exit. He is the only person that I know of that has used it as an entrance since we have open this gate." Def. Ex. D-5; Pl. Ex. 9.

Ramzinski later emailed Emilie Garcia in HR, "Ricky wrote a statement and named Alex Lopez and Jerry Martinez as two other drivers going through the gate. He also mentioned 'Garcy' was the LF [landfill] person that stopped him. You may want to get his statement as well. Alex and Jerry are already gone for the day but we will interview them on Monday and take appropriate action if they went through as well." Pl. Ex. 9.

Ramzinski states that entering the landfill through the temporary exit was a serious infraction because it exposed Defendants to legal risk of losing the landfill permit, issued by the Texas Commission on Environmental Quality ("TCEQ"), as well as potential Notices of Violation and fines from TCEQ. Def. Ex. D (Ramzinski Decl.). If the permit was lost, the landfill would have to be shut down, costing potentially millions of dollars. *Id.*[11] Ramzinski further states entering through the exit is dangerous because other traffic entering the landfill would not be expecting the oncoming traffic, which could result in a collision. *Id.* Whiteside testified that a landfill employee would not have authority to give Plaintiff permission to enter through that gate because it is a permit violation. Whiteside depo. at 75. In the past, when the exit gate had been used as an entrance, Republic had gotten a temporary permit from TCEQ. *Id.* at 76. He testified that no other drivers went through the exit gate except when a temporary permit was in place. *Id.* at 77.

_____

11 Whiteside similarly testified that entering through the exit gate "was a serious infraction because it exposed Republic of SA to legal risk in the form of potential Notices of Violation ("NOVs") and fines from the TCEQ and put us in danger of losing our permit to operate the landfill. If we lost our TCEQ permit, we would lose our ability to operate the landfill. If the landfill shut down, Republic of SA could potentially lose millions of dollars." Def. Ex. N. Whiteside testified that on a scale of 1 to 10 it was a 100 because of legal and monetary issues. Whiteside depo. at 153. Whiteside recalled wanting to terminate all three drivers who had done it, but HR told him he could not terminate Lopez and Martinez. Whiteside depo. at 154. Ramzinski also testified that Whiteside recommended higher discipline to Lopez and Martinez but they were told by HR to follow the progressive discipline plan. Ramzinski depo. at 70.

Ramzinski testified that Plaintiff told him he asked Garza if he could go through the gate and Garza said yes, but Garza is not a supervisor. Ramzinski depo. at 30. Further, Ramzinski assumed Garza did not give permission because "why would he report it if he gave him permission to do it? Why would he even say anything?" Ramzinski depo. at 31. Plaintiff testified he did not know it was a permit violation and stated he had never received training about that. Pl. depo. at 155, 159. Plaintiff testified that none of the drivers would have known it was a violation, and he had seen wreckers and company landfill personnel go in that gate. Pl. depo. at 160.

Plaintiff was suspended while the incident was investigated, and Plaintiff was then terminated pursuant to the progressive discipline policy. The Correction Action Form is dated November 21, 2017 and cites "failure to meet work standards" and "Other: LF Permit violation." Def. Ex. M. The box for "termination" is checked. *Id.* The form states, "Ricky, On 11-17-17 you went through the exit only gate of the landfill off of FM 1516. The gate is clearly marked as an exit only. Entering the Landfill through this gate is a violation of the TCEQ permit. Ricky, due to your current corrective action progression, your employment is hereby terminated." *Id.* The form is signed by Lockhart, his supervisor, as well as Ramzinski and Whiteside as next level managers. *Id.* Ramzinski emailed Emilie Garcia to let her know "[w]e put Ricky on suspension pending the investigation" and "Ricky L also signed the corrective action form." Pl. Ex. 9.  Garcia asked, "How are drivers aware that they are not allowed to go through the gate?" Pl. Ex. 9. Ramzinski responded, "Signage at gate." *Id.* As noted, Plaintiff disputes that the sign indicated "exit only." Pl. Ex. 10 (Lockhart Decl.). On November 21, Garcia emailed Whiteside to say she had "spoken to Joe and Celeste and we are moving forward with a termination today." *Id.*

Two other drivers who entered the landfill through the exit gate on the same date, Alex

Lopez and Jerry Martinez, also received disciplinary action, but they were at earlier stages of the progressive discipline policy and were not terminated. Def. Ex. O (Lopez corrective action form); Def. Ex. P (Martinez corrective action form); Whiteside depo. at 79 ("Same discipline process, yes."). The Corrective Action Forms contain the same language about going through the gate clearly marked as an exit only and that "entering the Landfill through this gate is a violation of the TCEQ permit." Lopez received a first written warning "due to [his] current correction action progression." Def. Ex. O. The form is signed by the same supervisors as Lockhart's form. *Id.* Martinez received a "documented verbal warning" "due to [his] current corrective action progression." Def. Ex. P. The form is signed by the same next level supervisors as Lockhart's form (Ramzinski and Whiteside), but a different direct supervisor. *Id.*

Plaintiff filed an EEOC charge on April 19, 2018, and received his right to sue letter. He filed this lawsuit on July 25, 2018. The live complaint (docket no. 30) asserts the following claims: (1) race discrimination in violation of Title VII and § 1981 against Republic, RS of San Antonio, Republic of Texas, and Allied; (2) retaliation in violation of Title VII and § 1981 against Republic, RS of San Antonio, Republic of Texas, and Allied: (3) failure to pay overtime in violation of the FLSA against all Defendants; and (4) retaliation in violation of the FLSA against all Defendants.

Defendants move for summary judgment as to all claims. In response to the motion for summary judgment, Plaintiff concedes dismissal of the Title VII and § 1981 retaliation claims, but no other claims.

### Evidentiary Objections

Plaintiff's objections to the deposition excerpts submitted by Defendants on the basis that they failed to include signed and dated reporter's certificate pages is overruled because Defendants

have filed a supplemental appendix with signed versions and Plaintiff has submitted complete versions of these depositions with his response.

Plaintiff objects to certain portions of Exhibit D, Ramzinski's Declaration, and to the documents attached thereto as hearsay and hearsay within hearsay because neither Ramzinski nor anyone else associated with Defendant has proven them up as business records. Defendants respond that the documents have been authenticated by the Declaration of Ramzinski, who attests they are true and correct copies. *See* FED. R. EVID. 901(b)(1) (testimony of a witness with knowledge that an item is what it is claimed to be will satisfy authentication requirement); Ramzinski Decl. ¶¶ 4, 5, 6, 10, 12 (authenticating D-1, D-2, D-4, D-3, and D-5, respectively). However, authentication under Rule 901 is not enough to prove the business records hearsay exception of Rule 803. *U.S. Commodity Futures Trading Comm'n v. Dizona*, 594 F.3d 408, 417 (5th Cir. 2010). Nevertheless, the Court overrules the hearsay objection.

Since the 2010 amendment to Rule 56, "[a]t the summary judgment stage, materials cited to support or dispute a fact need only be *capable of* being 'presented in a form that would be admissible in evidence.'" *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (emphasis in original) (quoting FED. R. CIV. P. 56(c)(2)). Thus, "evidence need not be authenticated or otherwise presented in an admissible form." *Maurer v. Independence Town*, 870 F.3d 380, 384 (5th Cir. 2017). When a plaintiff objects that material cannot be presented in a form that would be admissible in evidence, the objection functions much as an objection at trial, with the burden on the proponent to show that the material is admissible as presented or explain the admissible form that is anticipated. *Lee v. Offshore Logistical & Transp.*, LLC, 859 F.3d 353, 355 (5th Cir. 2017).

18

Plaintiff objects to the documents as not proved up under the business record exception to the hearsay rule, though he does not assert that they could not be submitted in an admissible form. Ideally, Defendants would have responded by providing a proper business records affidavit, but the Court nevertheless overrules Plaintiff's objection because he does not assert that the records could not be presented in an admissible form. Because these records presumably could be proved up as business records -- policies, pay plans, and pay records are typically kept in the course of a regularly conducted activity of a business -- they are presumably capable of being presented at trial in a form that would be admissible, and Plaintiff has not asserted otherwise. *See Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017) ("This flexibility [of Rule 56(c)(2)] allows the court to consider the evidence that would likely be admitted at trial—as summary judgment is trying to determine if the evidence admitted at trial would allow a jury to find in favor of the nonmovant—without imposing on parties the time and expense it takes to authenticate everything in the record."); *see also Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) ("Gannon complains that Hung's statement is partly based on hearsay, but does not even attempt to argue that the information contained in Hung's statement could not have been presented in an admissible form at trial. We conclude that the district court did not abuse its discretion in overruling Gannon's hearsay objection.").

Further, although Plaintiff broadly asserts that the documents are hearsay or contain hearsay within hearsay, Plaintiff does not identify statements within the documents that are being offered for their truth that would constitute hearsay. The email from Franco to Ramzinski (D-5) is not admitted for its truth, but to establish the employer's reasons for an employment action. *Nobles v. Cardno, Inc*., 549 F. App'x 265, 268 (5th Cir. 2013) (holding that when complaints from other

employees are offered to show the reasons for an employment action, the allegations are not hearsay). Similarly, Ex. D-1, one of Plaintiff's sample route sheets, is not being offered for the truth of the statements written by Plaintiff therein, but simply as an example of how Plaintiff filled out his route sheets. Moreover, Ramzinski and Whiteside testified about the progressive discipline plan and the pay plan, and thus consideration of the documents is redundant and unnecessary.

Further, Plaintiff's objection to Ramzinski's declaration concerning the regen process (paragraphs 7-9) is overruled because Ramzinski is not testifying as an expert and his opinions about the regen process are proper lay witness testimony based on his knowledge and experience working with the diesel trucks. Ramzinski may also testify about his determination that Lockhart must have pushed the button without qualifying as an expert. Plaintiff's objection to paragraph 10 as containing inadmissible hearsay insofar as Ramzinski testified about the fact that they were informed that the button was pushed over 40 times is overruled because the statement is not offered for its truth, but rather about the motivation for the employment decision (whether true or not). Plaintiff's objection to paragraph 11 as containing hearsay about Plaintiff distracting the mechanic and disobeying Juarez's orders is overruled as it is not offered for its truth, but rather as the motivation for the employment decision (whether true or not). Plaintiff's objection to Ramzinski's Declaration as speculation about whether Juarez was aware of Plaintiff's complaints about his pay is granted. Plaintiff's objection to Ramzinski's Declaration as speculation about whether Frank Franco was unaware that Lockhart had made complaints is granted.

Plaintiff's objections to Exhibit E, Plaintiff's 2012 offer letter, Exhibit F, the driver meal period acknowledgement, Exhibit G, the April 2017 Employee Corrective Action Form, Exhibit H, a group of employee counseling forms, Exhibit I, the June 2017 Employee Corrective Action

Form, Exhibit K, the July 2013 Commitment to Vehicle Care Excellence, Exhibit L, the September 2017 Employee Corrective Action Form, Exhibit M, the November 2017 Employee Corrective Action Form, Exhibit O, Lopez's November 2017 Employee Corrective Action Form, and Exhibit P, Martinez's November 2017 Employee Corrective Action Form, Exhibit Q, Martinez's counseling forms, as not having been proved up as a business record and as hearsay are overruled for the same reasons discussed above. Plaintiff has not argued that these could not be presented in an admissible form by Defendants through a business records affidavit. In addition, Plaintiff has submitted the counseling and corrective action form exhibits himself as part of Plaintiff's Exhibit 8. Moreover, witnesses (including Plaintiff) testified as to the contents of these documents and thus consideration of the documents themselves is not necessary.

Plaintiff objects to portions of Exhibit J, Hilda Juarez's Declaration. Plaintiff objects to paragraph 5 as inadmissible hearsay and speculation. The Court excludes the sentence "The outside vendor determined that Mr. Lockhart was consistently bypassing the regen function on the truck." The Court also excludes the sentence "The outside vendor had no knowledge of the identity of the driver of the truck." However, the Court overrules the objection to "The vendor reported that the regen function was bypassed over 40 times" as that is neither hearsay (not offered for its truth) nor speculative. Plaintiff objections to paragraph 11 as inadmissible speculation starting with "[I] believe that Mr. Ramzinski intended to work" to the end of the paragraph. That objection is sustained. Plaintiff objects to paragraph 12 as entirely inadmissible speculation. That objection is overruled as Juarez may testify as to her belief that Plaintiff was disrespectful to her because she is a woman and that, at times during the incident, Plaintiff wouldn't look at her or talk to her and would only engage with her male supervisor as based on her personal knowledge.

Plaintiff objects to paragraph 5 of Whiteside's Declaration because Whiteside was not designated as an expert to testify about the particulars of the TCEQ permitting process or the legal implications of violating same. This objection is overruled, as Whiteside can testify from his knowledge and experience as General Manager, and does not need to be qualified as an expert.

## Analysis

### A. Title VII and § 1981

The Court analyzes the Title VII and § 1981 claims together under Title VII because they are governed by the same standard. *See Harville v. City of Houston, Miss.*, 945 F.3d 870, 874 n.10 (5th Cir. 2019) ("Although [Plaintiff] brings her claims under Title VII and Section 1981, "we refer only to Title VII, because 'when used as parallel causes of action, Title VII and Section 1981 require the same proof to establish liability,' and 'it would be redundant to refer to both of them.'").

Title VII plaintiffs may prove a racial discrimination claim either by direct or circumstantial evidence. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). Defendants contend, and Plaintiff does not directly dispute, that there is no direct evidence of discrimination and thus this case should be analyzed under the *McDonnell-Douglas* burden-shifting framework. Plaintiff appears to concede application of this framework where he asserts that "stray remarks" testified to by certain witnesses "can still play a role under *McDonnell-Douglas*" and contends that this case is similar to *Goudeau v. National Oilwell Varco, L.P.*, 793 F.3d 470 (5th Cir. 2015), a case analyzed under the ADEA *McDonnell-Douglas* framework for circumstantial evidence. Although Plaintiff contends that alleged racially derogatory statements about Plaintiff by Ramzinski "cannot be dismissed as mere stray remarks,"

he also contends that "Lockhart meets his *prima facie* burden based on these comments alone" under the "more relaxed" standard in *Goudeau*. Plaintiff does not attempt to establish that the alleged comments constitute direct evidence of discrimination making the burden-shifting framework of *McDonnell-Douglas* inapplicable.[12]  Rather, as discussed below, he appears to assert that the comments can establish his *prima facie* case of race discrimination under the *McDonnell-Douglas* framework in a Title VII case.

Under the *McDonnell-Douglas* framework, a Title VII plaintiff must first make out a *prima facie* case for race discrimination, by showing that he (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was treated less favorably than other similarly situated employees outside the protected group. *Id*. Although there are variations of the *prima facie* test, most of which differ at the fourth element, *see Heggemeier v. Caldwell Cty., Tx.*, 826 F.3d 861, 867 (5th Cir. 2016), this is the formula that Defendants propose, Defendants' motion at 12, and the Court concludes is applicable here.

There is some confusion in the briefing, however, because Defendants then argue that Plaintiff has not made a *prima facie* case because he cannot show "*that any alleged adverse employment action was racially motivated or* that he was treated less favorably than any similarly situated employee outside his protected category." Defendants' motion at 13 (emphasis added). Thus, it is unclear whether Defendants are invoking a *prima facie* standard for the Title VII race

---

12  To be direct evidence, we look to whether the comments are (1) related to the plaintiff's protected characteristic; (2) proximate in time to the challenged employment decision; (3) made by an individual with authority over the challenged employment decision; and (4) related to the challenged employment decision. *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 476 (5th Cir. 2015); *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 222 (5th Cir. 2001). Plaintiff's evidence is only that Puga (a swing driver) sometimes heard Ramzinski say racially derogatory terms in Spanish. Puga depo. at 94. There is no evidence of proximity to the challenged employment decision or that they were routinely made, nor is there evidence that the comments related to the challenged employment decision.

discrimination claim in which the fourth element can be shown by establishing that the employee was otherwise discharged because of his race.[13] Plaintiff appears to think so, and applies this *prima facie* standard, arguing that alleged racial comments by Ramzinski and testimony of other workers about a hostile work environment with racial slurs can satisfy his *prima facie* burden. However, Plaintiff cites only ADEA cases in this regard, such as *Goudeau v. National Oilwell Varco, L.P.*, 793 F.3d 470 (5th Cir. 2015), which unquestionably allow the employee to satisfy the *prima facie* case fourth element by showing that he was "otherwise discharged because of his age." *Id.* at 474; *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005); *Rachid v. Jack In the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004).

Although the Court has located a few unpublished Fifth Circuit cases setting forth the fourth element of a *prima facie* case in a Title VII race discrimination case as "she was replaced by someone outside the protected class, other similarly-situated employees were treated more favorably, or she was otherwise discharged because of her race," or something similar,[14] the Court has not located any published cases setting forth the Title VII *prima facie* case that way. And other published and unpublished cases clearly distinguish the *prima facie* burdens between Title VII and ADEA cases, including the "otherwise because of" element only for ADEA cases. *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 353 n.26 (5th Cir. 2005) ("'We have found that a plaintiff may satisfy the fourth prong of a prima facie case in a Title VII suit by presenting evidence that he was terminated while "others who were not members of the protected class remained in similar

---

13 Or it may be that Defendants are not clearly differentiating the *prima facie* case standards between the Title VII discrimination and retaliation claims. A plaintiff successfully establishes a prima facie case of retaliation if he demonstrates that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013).

14 *Nguyen v. Univ. of Tex. Sch. of Law*, 542 F. App'x 320 (5th Cir. 2013); *Lawson v. S. Components, Inc.*, 410 F. App'x 833 (5th Cir. 2011); *Ebbs v. Folger Coffee Co.*, 140 F.3d 1037 (5th Cir. 1998) (unpublished)

positions.' With respect to ADEA claims, however, we have held that a plaintiff may satisfy the fourth prong of his prima facie case with evidence that he was 'otherwise discharged because of his age.' Although the ADEA test differs from the Title VII test, evidence of disparate treatment may still logically suggest a discriminatory motive for purposes of establishing a prima facie case of age discrimination.") (citations omitted); *Brown v. Bunge Corp.*, 207 F.3d 776, 781 (5th Cir. 2000) ("The first three elements of a prima facie case of age discrimination under the AEDA and discrimination under Title VII are identical. For the fourth element in an age discrimination case, the plaintiff must show that "he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age.") (citations omitted); *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 318-19 (5th Cir. 1997) ("The first three elements of a prima facie case of age discrimination are identical to those of a Title VII prima facie case. The fourth element is similar, although we have worded it somewhat differently: The plaintiff must show that she "was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of [her] age."); *Bauer v. Albermarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999) (same); *see also Dees v. United Rentals N. Am., Inc.*, 505 F. App'x 302, 304 (5th Cir. 2013) (fourth element for Title VII prima facie case is that employee "received less favorable treatment due to his membership in the protected class than did other similarly situated employees who were not members of the protected class, under nearly identical circumstances," while ADEA fourth element is "showing that "he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age).

       Title VII and the ADEA also have different ultimate causation standards. Given these

differences and the lack of any apparent published Fifth Circuit cases applying an "otherwise discharged because of race" standard to the fourth element of the *prima facie* case under Title VII, the Court will not apply that standard, and will reserve the causation analysis for the third step (causation) in the framework.

If the plaintiff makes the *prima facie* showing, the burden then shifts to the employer to set forth some legitimate, non-discriminatory reason for its decision. If the employer does so, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is a pretext for discrimination or that race was a motivating factor in the employer's decision.

1. *Prima Facie* Case

As to Plaintiff's *prima facie* case, Defendants concede that Plaintiff belongs to a protected group, African American, that he was qualified for his position, and that he was subjected to an adverse employment action, his termination. Defendants contend that Plaintiff has not shown an adverse employment action connected to his race and cannot show any comparators who were treated more favorably, and thus his racial discrimination claims fail. Defendants note that Lopez and Martinez were also disciplined for driving into the landfill exit, and the type of discipline was only different because they were at earlier stages of the progressive discipline policy. Lopez received a documented verbal warning and Martinez received a first written warning, and Defendants contend that Plaintiff was simply farther along in the progressive discipline plan than they were.

With respect to the similarly situated employee requirement, a plaintiff must show that he was treated less favorably than others not in the protected class, under nearly identical circumstances. *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019). "The employment actions

being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Harville v. City of Houston, Miss.*, 945 F.3d 870, 875 (5th Cir. 2019). Each employee's track record at the company need not comprise the identical number of identical infractions, albeit these records must be comparable. *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009); *see also Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012). *Lee* holds that two employees were similarly situated where they held identical positions, compiled a similar number of violations over a similar period of time, including an identical infraction for which the plaintiff was fired and the comparator was granted leniency, and their ultimate employment status rested with the same person. *Garcia v. Prof. Contract Servs., Inc.*, 938 F.3d 236, 244 (5th Cir. 2019).

The Court agrees that Plaintiff has failed to satisfy his initial burden of establishing a *prima facie* case because he has not demonstrated that he was treated disparately from any other similarly situated driver. Although Lopez and Martinez committed the same offense as Plaintiff, they did not have comparable track records of violations under the progressive discipline policy. In other words, the alleged comparators did not have a similar number of violations over a similar period of time, and thus Plaintiff has not shown that Lopez and Martinez's employment histories are comparable to his own. *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 218 (5th Cir. 2016) ("[Plaintiff] has not shown that any of [the comparators] shared her history of on-the-job violations."). When a difference between a plaintiff and the proposed similarly-situated employee "accounts for the difference in treatment received from the employer, the employees are not

27

similarly situated for the purposes of an employment discrimination analysis." *Lee*, 574 F.3d at 260.

Plaintiff contends that Defendants did not follow the progressive discipline plan because the regen incident was written up as a "verbal" on the Corrective Action Form, and then the Juarez shop floor insubordination issue was a "suspension," and the gate issue a termination, thus skipping the first written warning. Docket no. 45-1. Plaintiff argues that he should have received a written discipline over the shop floor incident, which would have made the gate incident a suspension instead of a termination, and "Ramzinski and Whiteside's joint decision to leapfrog the written step while observing the process for Lopez and Martinez is at least some evidence of disparate treatment on the basis of race and/or making complaints over pay." *Id.* Although the regen incident was marked as "verbal," it was a second violation within twelve months from the verbal written warning, and thus could and should have been classified as a written warning. Def. Ex. D-5 (progressive discipline plan). In addition, the progressive discipline policy states that "[a]ny preventable incident will begin at this step," and the regen incident would qualify as a preventable incident. Thus, it appears that the wrong box ("verbal" instead of "written") was checked on the corrective action form.

But even if Defendants did not exactly follow the progression of the plan, the evidence shows that Martinez was given a verbal warning and then a written warning, while Plaintiff was given two verbal warnings, a suspension, and then termination (still four corrective actions), which does not show disparate treatment as to the termination. Instead, Plaintiff's own Exhibit 8, a chart meant to show disparate treatment, plainly demonstrates that Plaintiff's disciplinary history was not comparable to, and in fact exceeded, that of Lopez and Martinez. However, given Plaintiff's

arguments, the Court will also consider the remainder of the *McDonnell-Douglas* analysis as if Plaintiff had established a *prima facie* case.

2. Legitimate, Non-Discriminatory Reason

Defendants contend that, even if Plaintiff could make a *prima facie* case, he was disciplined and terminated for legitimate, non-discriminatory reasons, consistent with the progressive disciplinary plan. Plaintiff received a documented verbal warning after failing to correctly record his container pay on April 14, 2017, despite having been counseled on this issue. Next, Plaintiff received a corrective action on June 7, 2017 for the regen button issue. While Plaintiff denied pushing the inhibit button more than 40 times and causing damage to his truck, Ramzinski determined that Plaintiff pushed the button, and it was reasonable for him to make that determination. Plaintiff received a three-day suspension on September 5, 2017 when he was insubordinate to Juarez and was not wearing PPE. Although Plaintiff denies being insubordinate, this incident was reported to Ramzinski by Juarez. Plaintiff's final infraction, resulting in his termination of employment, occurred on November 17, 2019 when he entered through the exit of the landfill in violation of a TCEQ permit. Plaintiff does not deny that he entered the landfill through the exit on that date.

The Court finds that Defendants have articulated a legitimate, non-discriminatory reason for issuing the disciplinary actions and for terminating Plaintiff. Even if Ramzinski/Defendants were mistaken in the conclusions that Plaintiff engaged in the underlying conduct, that does not negate a finding that the reasons were legitimate and non-discriminatory.

Plaintiff contends that Defendants did not follow the four-step disciplinary process because they skipped the first written warning and because the first "verbal" Corrective Action Form

Lockhart received was for putting down what Ramzinski claimed was the wrong container pay, but that discipline was never rescinded despite Whiteside eventually coming to adopt Lockhart's method of counting. Plaintiff argues that Defendants cannot justify their actions by pointing to a progressive discipline policy they did not follow. However, Defendants provide an explanation for each of the disciplinary actions taken, and thus whether they followed their progressive discipline plan or not does not affect the issue of whether they provided a legitimate, non-discriminatory reason for the actions taken. Instead, the Court will consider these arguments as part of the pretext analysis.

3. Pretext

Because Defendants have stated a legitimate, non-discriminatory reason for Plaintiff's discipline and termination, the burden shifts to Plaintiff to show pretext. A plaintiff may establish pretext "by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton v. Gap Inc*., 333 F.3d 572, 578 (5th Cir. 2003). In conducting a pretext analysis, the court does not "engage in second-guessing of an employer's business decisions." *Roberson-King v. La. Workforce Comm'n*, 904 F.3d 377, 381 (5th Cir. 2018). To overcome a legitimate, nondiscriminatory reason for termination, the plaintiff must show something beyond disagreement with the employer's decision. *Witmer v. Phillips 66 Co.*, 915 F.3d 328, 332 (5th Cir. 2019) (citing *Bryant v. Compass Grp. USA Inc*., 413 F.3d 471, 478 (5th Cir. 2005) ("Disparate treatment of similarly situated employees is one way to demonstrate unlawful discrimination and retaliation.")). The issue at the pretext stage is not whether the employer's reason was actually correct or fair, but whether the decisionmakers honestly believed the reason. *Harville v. City of Houston, Miss.*, 945 F.3d 870, 877 (5th Cir. 2019).

As the Supreme Court acknowledged in *Reeves*, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false" may be sufficient to infer discrimination. *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 513-14 (5th Cir. 2001). The Supreme Court has also made clear, however, that "instances [exist] where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.* For example, "no rational factfinder could conclude that the action was discriminatory ... if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred." *Id.*

Defendants contend that the record contains no evidence that would raise a genuine issue of material fact on the issue of pretext or that race played a causal role in Plaintiff's termination. Plaintiff contends that his testimony and that of his co-workers as to the regen button incident, shop floor incident, and gate incident raise a fact on pretext and demonstrate discriminatory motive.

*Regen button incident*

Lockhart denies that he pushed the regen inhibitor button as alleged and contends that Defendant's evidence is not strong enough to overcome his denial, creating a fact issue. Plaintiff argues that fellow Republic worker Puga's testimony also creates a fact issue, given that there was no way to Puga's understanding that Lockhart could have caused the alleged damage by pushing the regen button too many times; to the contrary, Puga knew Lockhart to be someone who took

good care of his truck. Docket no. 43 at 13 (citing Puga depo. at 117-120). Plaintiff argues that, "Puga, who credibly testified to having a great deal of experience driving Republic trucks during his long tenure with Republic, could not even understand the supposed issue caused by Lockhart's pressing the Regen button too many times." Docket no. 43 at 13 (citing Puga depo. at 143-144). Plaintiff further contends that fellow roll-off driver "Hankins didn't understand that issue because if the truck did not react after pushing the button a few times, then it would have been a simple matter of writing the issue up at the end of the day" and "Lockhart was never known to be hard on his truck." Docket no. 43 at 13 (citing Hankins depo. at 84-85). Plaintiff further complains that there is no competent summary judgment evidence proving that the button was pushed so many times.

Plaintiff's reliance on the testimony of former Republic drivers Puga and Hankins does not help him establish pretext. Both testified that they did not understand the discipline, but the testimony is muddled, and it appears they are often discussing the regen button itself, which would blink when regen was required and needed to be pushed to start the regen process, rather than the regen inhibition button, which would bypass the regen function. Further, Puga agreed that if you push "the button on the bottom to reject" the regen process and regen the truck later, "[t]hat will mess [the truck] up." Puga depo. at 118.

Plaintiff does not dispute that his truck was sent for maintenance and that the third-party maintenance provider stated that the issue was caused by the regen inhibition button having been pressed too many times. Whether the maintenance issue was caused by the regen inhibition button having been pushed that many times or whether Plaintiff pushed the button that many times or at all is not the relevant inquiry, since Plaintiff does not provide any evidence to cast doubt on the fact

that Defendants, and especially decisionmakers Ramzinski and Whitehead, believed that to be true and acted on that basis. The Court detailed the bases for their decisions above, and the decisions were reasonable. Plaintiff fails to establish pretext.

*Shop floor incident*

Plaintiff argues that he denied that he had pulled a mechanic off of his job to attend to his personal vehicle, violated the policy for wearing PPE, or that he was insubordinate toward Juarez, yet he was disciplined over conduct that he contended was a lie. He further complains that Ramzinski refused to review video that would have been available for the day in question. Plaintiff contends that Hankins testified that "every day somebody was doing something like that," and he was aware of some employees even parking their personal vehicles in the work bays, as well as guys washing their personal vehicles. Hankins depo. at 80-82. Plaintiff also argued that wearing PPE was not strictly enforced, citing Hankins' testimony that not everyone wore PPE and not everyone got in trouble for it, and that the idea of Lockhart getting written up over the Shop Floor Incident was "a set up." Hankins depo. at 83, 92-94. Puga testified that the discipline dispensed against Lockhart over the Shop Floor Incident was bogus as it was commonplace for people to speak with shop employees about issues they were having with their cars and no discipline was dispensed for doing so. Puga depo. at 113-114, 116-117.

Plaintiff focuses mainly on his denial of pulling the mechanic from the shop floor, instead stating that he was talking to him initially when he was working on his vehicle condition report. Plaintiff also denies being disrespectful to Juarez because she was a woman. But Plaintiff does not deny returning to talk to the mechanic after having been instructed by Juarez not to. Further, "[i]n cases in which an employer discharges an employee based on the complaint of another employee,

the issue is not the truth or falsity of the allegation, but 'whether the employer reasonably believed the employee's allegation and acted on it in good faith.'" *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010). The fact that Ramzinski did not investigate and review video footage that Plaintiff contends (without proof) would have been available, is insufficient to demonstrate that Ramzinski did not act in good faith based on Juarez's report. And Plaintiff's assertion that Ramzinski did not believe Plaintiff disrespected Juarez because she was a woman is irrelevant because Ramzinski did not discipline Plaintiff for that reason. In addition, witness testimony from Puga and Hankins that others routinely talked to mechanics about their cars or failed to wear PPE and were not disciplined fails to establish pretext because there is no evidence that these individuals were not disciplined under nearly identical circumstances. Generalized testimony that other unidentified people at other unidentified times engaged in the same conduct but were not disciplined is insufficient. Plaintiff fails to establish pretext.

*Gate incident*

Plaintiff does not deny driving into the exit gate off FM 1516. Pl. depo. at 150. Nor has he provided any evidence that it was not a violation of the TCEQ permit. To establish pretext, Plaintiff denies the gate was marked as an exit gate, denies that any drivers knew this was a permit violation, states Garza gave him permission to enter, and offers testimony that others entered the gate without discipline.

Plaintiff denies that the gate was marked as an exit gate and produced a picture he took on May 29, 2018. The sign in the picture does not indicate that it is an "exit only" gate but simply states the address of the site entrance location. Pl. depo. at 151. See Ex. 4 at 333 (Ex. 45 to Lockhart Dep.). Plaintiff asserts that he testified the picture accurately showed the gate as he

34

entered that day in November 2017 (citing Pl. depo. at 150-151), but he does not expressly so state. He states "There's no sign exit. I took a picture of it soon after that, right. Q. When did you take the picture? A. I'll show you. It had to be not too far after they terminated me, I think. I was looking at it a while back. There it go. Yeah, that's the one I went through." Then later defense counsel asked, "So that picture that you just showed me is the – is the gate that you went through?" and Plaintiff responded, "Yes, ma'am." Plaintiff does not unequivocally state that the sign was the same as the date of his entry. Further, Wilson, a landfill spotter, testified that there used to be an exit sign there. Wilson depo. at 113. Even assuming the sign was the same as in the picture and did not say "exit" or "exit only," Ramzinski apparently believed the sign to state "exit only" and Plaintiff himself testified that he was not sure if he could enter through that gate, so he went to see if he could.

Plaintiff further asserts that he had never been told not to use the gate, and that it had been used on other occasions by others. Pl. depo. at 159-160. Plaintiff notes that Hankins confirmed that the gate in question had been used in the past by Republic employees, who were the only ones with the keys to open the gate. Hankins depo. at 50-52. According to Plaintiff, Hankins believed it was because Lockhart had a "target on his back," and in his experience the only way that gate would have been open is if someone from the landfill had opened that gate, and he specifically recalled seeing trucks going into that gate because it is on his way home from work. Hankins depo. at 87-90. Wilson, who worked at the landfill starting in 2014, testified that "other employees at Republic Service [were] allowed to go through that gate, from the manager and the supervisors at the landfill. [] I think he was wrongfully disciplined [] They do it all the time there. I worked there for five years." Wilson depo. at 17-18. Wilson testified extensively about how much that side gate was used by other drivers, stating that during the "time I was there, nobody ever got in trouble for

going through those gates." Wilson depo. at 104-110. Wilson testified that Garza could  have easily denied Plaintiff the right to get the scale ticket that he needed to drop his load at the landfill. Wilson depo. at 126-28.

Puga also testified that "we were all coming in through the side door. [] A couple days later, I found out that it was Ricky Lockhart who got the trouble because he went through the side gate, went to the scale, and then went and dumped. We all did that." Puga depo. at 34-35. Puga further testified that he knew others who went through that gate on or around that date who did not get in trouble: "Ram goes through the gate, Sergio goes through the gate, Mike Martinez went through the gate. We all went through the gate. [] Dispatch told us to come through [the side gate]. [] … we all did it, but he got in trouble." Puga depo. at 36-37. Puga also testified, "We didn't know about no permits. Nobody ever told us about any permits. … Because if the permit was that we weren't allowed to go in through the side gate, we would never go through the side gate. We went through the side gate. … I know for a fact I was coming through that side gate, that they had it open for us. Other companies weren't allowed, just our company." Puga depo. at 40-41.

Plaintiff's witness testimony that others went through the side gate without discipline is too generalized to establish that any of those persons were similarly situated to Plaintiff to establish disparate treatment. Hankins admitted that he had no personal knowledge regarding whether or why people might be entering through the exit gate. Hankins depo. at 89–90. He did not testify that he ever personally used that exit gate to enter the landfill or identify by name any other driver who did. It is unknown whether any supervisor at the landfill or at Republic of San Antonio was aware of any allege unauthorized use of the exit, or if any of the instances were in fact unauthorized. Landfill employees who were not hauling dump materials may have been permitted to enter

through the gate since the landfill regulates dump materials but would not necessarily have the same concerns about drivers who were not hauling dump materials or about landfill employees. Similarly, Whiteside testified that there had been temporary TCEQ permits allowing use of the gate, and it is unknown whether those other persons (assuming they were even roll-off or waste removal drivers) went through the gate during those times. Thus, Plaintiff fails to establish disparate treatment as a basis for pretext.

Plaintiff further contends that similarly situated non-African-American drivers (Lopez and Martinez) were not similarly disciplined over the same conduct of entering the gate in November 2017, citing his comparative discipline chart for the three drivers (Pl. Ex. 8). Defendants contend that Plaintiff's Exhibit 8 does not establish that Lopez or Martinez were treated more favorably than Plaintiff for the conduct of entering the landfill through the exit gate. Instead, Defendants contend it shows that all individuals were disciplined for the conduct, though the form of discipline was different based on where they were in the progressive discipline scheme. As discussed previously, the Court agrees that Lopez and Martinez were not similarly situated because they had different discipline histories.

Similarly, the fact that Plaintiff contends that Garza, whom he believed to be a gate supervisor or landfill supervisor, gave him permission to enter that day does not establish pretext. Garza stated in his statement, provided by Plaintiff, "I asked him that he cannot be doing that because it's only an exit." Pl. Ex. 7. Garza does not state that he gave Plaintiff permission to enter. Nevertheless, even if Garza acquiesced or gave explicit permission, that does not establish pretext. Ramzinski testified that he assumed Garza did not give permission because "why would he report it if he gave him permission to do it? Why would he even say anything?" Ramzinski depo. at 31.

Plaintiff fails to establish that Ramzinski believed Plaintiff had been given permission but disciplined him anyway, and the evidence further establishes that Garza had no authority to give permission in any event. Ramzinski received the report of the violation from Frank Franco, and it was reasonable for Ramzinski to rely on it. Thus, Plaintiff fails to demonstrate pretext.

*Alleged failure to follow progressive discipline plan*

As noted, Plaintiff argues that Defendants did not follow the progressive discipline plan because the second corrective action form was marked as "verbal" and the third was "suspension," thus skipping the "first written warning" step. A defendant's failure to follow its own policies is not probative of discriminatory intent under Title VII unless the plaintiff shows that he was treated differently than other non-minority employees. *See Turner*, 476 F.3d at 346. While Plaintiff contends that Martinez (who is not African American) was disciplined by being given a verbal and then a first written warning in accordance with the plan, while plaintiff was not, as noted, the failure to check the "written" box on the second corrective action form appears to be a clerical error, and Plaintiff in fact had four corrective actions, which would justify termination under the progressive discipline policy. While it is true that failure to follow a progressive discipline system may give rise to an inference of pretext, *see Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015), it does not under these facts.

*Alleged hostile work environment/Motivating factor*

Defendants also contend that Plaintiff offers no evidence that his discipline or termination was racially motivated, and in fact repeatedly testified that the actions were taken against him because of his complaints about his rate of pay. When asked if Ramzinski discriminated against him because of his race and what made him think Ramzinski acted based on race, Plaintiff replied,

"Well, some words, choice words that he had said and religion, and race I wouldn't know about how I could put that. Would he say because I'm black? No, I would say about race, religion discrimination and dislike because I kept coming to him with situation about my pay scale, and he was defining a dump and return different and this and that and the things we were saying so that's a lot -- a lot of disagreement and that's why I came up with the dislike and looking towards what my granddaughter was saying it's like hatred, still ain't got to that point, but dislike, yes." Pl. depo. at 19. Plaintiff also stated that Ramzinski retaliated against him because "we were back and forth with the box pay." Pl. depo. at 32. Even aside from Plaintiff's own testimony, Defendants contend that nothing in the record indicates the actions were racially motivated.

Although he did not plead a hostile work environment claim, Plaintiff responds by saying that "[t]he record evidence adduced during the depositions of Juan Puga and Robert Wilson paint a picture of a hostile work environment with severe and pervasive discrimination against African-Americans, generally, and Lockhart, specifically." Docket no. 43 ¶ 57. Plaintiff relies on the deposition testimony of Juan Puga, who worked for Republic (or a predecessor entity) since roughly 2000, who testified that it was "commonplace" and "regular" to hear the n-word used. Puga depo. at 92. Puga also recalled one time the word was used in Lockhart's presence, when someone said "You're a crazy n***r" in a group of people, and Lockhart "brushed it off," saying, "There's nothing I can do about it." Puga depo. at 20, 92. Puga testified that he witnessed persons refer to Lockhart as a "mayate," "pinche mayate," "negro," and "negrito," all terms being Spanish racial slurs that Lockhart would not understand. Puga testified that not only would such slurs be used when referring to Lockhart in Ramzinski's presence, but "sometimes [Ramzinski] would even say the words." Puga depo. at 93-94; 152-153.

Plaintiff also cites to Wilson's testimony that "[t]he discrimination there is bad. It's real bad." Wilson depo. at 68. Wilson, a landfill employee, testified to having been called the n-word by supervisor Chuy Velma, and nothing was done about it despite being brought to the attention of HR and the Landfill Manager. Wilson depo. at 30, 34-35; 61-63. Wilson testified that Garza and Velma would use racially derogatory terms, including the term "mayate," in reference to Lockhart over the years he worked there. Wilson depo. at 36-37, 37-38, 58-59. Wilson testified that Velma and Garza would tell him to direct Lockhart into the "sludge," an area of the landfill where trucks are prone to get stuck in extremely disgusting landfill materials, yet they would tell Wilson to direct non-African-American drivers to areas in the landfill that did not contain sludge. Wilson depo. at 49, 52, 57-58.[15]

The testimony concerning Garza and Velma, others at the landfill, and other workers at Republic of San Antonio does not help Plaintiff establish that race was a motivator for Defendant's employment decisions, as they are nonspecific as to time, place, and context, and were not made by persons responsible for the challenged employment action or by a person with influence over the decisionmaker. *See Reed v. Neopost USA, Inc.*, 701 F.3d 434, 442 (5th Cir. 2012) ("[W]e agree with its ultimate conclusion: the remarks are insufficient to create a fact issue. They are sporadic, in large part untethered to specific speakers or times, and attributed to harassers who had no responsibility for, or influence over, Reed's termination. Thus, they fail under both *CSC Logic* and *Russell*. Summary judgment was therefore appropriate.").

The testimony that Ramzinski himself used racial slurs at times is troubling, but ultimately does not establish a sufficient racial motive for the employment decisions at issue to survive

---

[15] Defendants' objections to the testimony that racial slurs were used because they are hearsay is overruled, as the statements are not being offered for the truth, but for the fact that they were made.

summary judgment. Puga testified that at times he heard Ramzinski use Spanish racial slurs for African Americans, but he does not testify that any such slurs were used in reference to Plaintiff or in connection with any employment decisions at issue or in general. The alleged statements were not made alongside any alleged discriminatory conduct. *See Kelly v. Costco Wholesale Corp.*, 632 F. App'x 779, 783 (5th Cir. 2015) (plaintiff could not establish pretext on remarks alone). In *Goudeau*, an ADEA case relied upon by Plaintiff, the Court considered the ageist statements to establish the plaintiff's *prima* facie case, and then also found that plaintiff had shown pretext because he had not been given the four written warnings that were part of the discipline plan until the day he was fired, even though they related to events on dates before that meeting. *Goudeau*, 793 F.3d at 476-77. The doubts about the warnings, combined with ageist comments potentially corroborated by the plaintiff and another older employee, would allow a jury to conclude that age was the reason for the termination. *Id.* at 477.

Here, we have only general allegations that Ramzinski sometimes used the racial slur "mayate" and there is insufficient evidence from which a jury could conclude that race was a motivating factor in the employment decisions. Puga, who testified he heard Ramzinski use the term "mayate," later said "for him it was a joke. It was something cool." Puga depo. at 152. He testified that foul and derogatory language happened all the time at the yard and "it was a normal thing." Puga depo. at 24. Thus, although the term is inherently derogatory, there is no testimony that it was used to display racial animosity against African Americans in general or Lockhart specifically.[16] Further, there is no evidence of racial animus with regard to Juarez, Franco, or the

---

16 Wilson recalled hearing from landfill employees Velma and Garza that "this N-word is going to get fired … [b]ecause they were talking to other people in management, like, Frank Franco would tell them what's going on, and he would tell them that this guy named Kenny had it out for Rick … And so they would take that out on Rick when they would see him … [Franco would be saying] this guy named Kenny has it out for Rick and they're trying to get rid

third-party company that identified the regen button issue as the problem. There is no evidence of racial animus on the part of Whiteside, who also approved the disciplines and eventual termination.

Last, the Court agrees with Defendants that Puga's testimony cannot undermine Plaintiff's own testimony that Ramzinski disliked him because of his complaints about pay. When asked why he believed Ramzinski discriminated against him and if he thought it was because of his race, Plaintiff responded, "Would he say because I'm black? No, I would say about race, religion discrimination and dislike because I kept coming to him with situation about my pay scale." Pl. depo. at 18. While Plaintiff may believe that race and religion played a role, his beliefs do not establish discrimination. Rather, the evidence, including his own testimony, indicates that his complaints about pay were a more likely explanation for any animus or disciplinary action. Even Puga's testimony supports the conclusion that, if some improper motive was at play, it was Plaintiff's complaints about pay, not race. Puga testified that management started saying there was "an issue" with Plaintiff before he even returned from the ROAD-EO. Puga depo. at 27, 75, 82-83. Puga testified that others were saying that Plaintiff "opened his f****ing mouth" and he "ruffled feathers he wasn't supposed to." Puga depo. at 78-80. Hankins testified that Plaintiff was going to higher ups and was looked at as a troublemaker for speaking up. Hankins depo. at 44, 54-55. Thus, the Court finds that Plaintiff has failed to raise a material fact issue on whether race was a motivating factor in Defendants' employment decisions.

Accordingly, the Court grants summary judgment in favor of Defendants on Plaintiff's Title VII and § 1981 claims.

---

of him." Ex. 2, Wilson Dep. at 39:13-40:6; 47:17-23; 48:4-12 (emphasis supplied). However, this testimony does not establish that Ramzinski used the n-word in reference to firing Plaintiff.

**B. FLSA**

Plaintiff alleges that Defendants failed to pay overtime in accordance with the FLSA. Docket no. 30 (Am. Compl). ¶ 80. Plaintiff complains that Defendants failed to compensate him and other drivers for all of their on-the-clock non-productive time (such as landfill waiting time, landfill dumping time, downtime, vehicular mechanical failure, traffic delays, customer service related issues, customer wait time, customer delay time, route delays, manifest changes, and DOT inspections). *Id.* ¶ 111. Instead, Defendants base pay on estimates of what Defendants believe the non-productive time should be, resulting in the underpayment of regular wages and overtime. *Id.* ¶ 112. Plaintiff complains that Defendants' calculation of Plaintiff's regular rate of pay does not comply with the FLSA because it does not include, as part of the calculation of the regular rate, all compensation owed for "on-the-clock" non-production time. *Id.* ¶ 113.

Plaintiff further complains that Defendants deducted 30 minutes from his and others' daily on-the-clock hours for a mandatory lunch break even though they were aware that Plaintiff and others regularly worked through their meal periods. *Id.* ¶ 117-120. Plaintiff complains that this systematic deduction of the 30-minute meal period resulted in drivers working overtime hours for which they were not compensated and deprived them of overtime pay in violation of the FLSA. *Id.* ¶ 121-22.Plaintiff complains that Defendants continued to do this even after settling similar claims in October 2015 in the *Serrano v. Republic* litigation in the Southern District of Texas. *Id.* ¶ 138. Plaintiff seeks, on behalf of himself and other similarly situated, all unpaid overtime compensation to which he is entitled.

Defendants contend that the record conclusively shows that Plaintiff was paid consistent with the FLSA, understood and agreed to the compensation scheme at issue, denied performing

any work off the clock, and cannot show that Defendants possessed knowledge of any uncompensated work. As to the retaliation claim, Defendants argue that Plaintiff cannot show he was engaged in activity protected by the FLSA when he made complaints about his pay rate.

    1. unpaid wage claim

The FLSA generally requires an employer to pay overtime compensation (at a rate of one and one-half times the regular rate of pay) to an employee after the employee has worked over 40 hours in one week. See 29 U.S.C. § 207(a)(1). The FLSA broadly defines "regular rate" as the hourly rate actually paid to the employee for "all remuneration for employment." 29 U.S.C. § 207(e); 29 C.F.R. § 778.109 (the regular rate of pay is a rate per hour). In other words, an employee's regular rate of pay is his compensation for the workweek stated on an hourly basis.

The Act does not require employers to compensate employees on an hourly rate basis; their earnings may be determined on a piece-rate, salary, commission, or other basis, but in such case the overtime compensation due to employees must be computed on the basis of the hourly rate derived therefrom and, therefore, it is necessary to compute the regular hourly rate of such employees during each workweek. 29 C.F.R. § 778.109. Where employees are paid on some basis other than an hourly rate, the regular hourly rate is derived by dividing the total compensation (except statutory exclusions) by the total hours of work for which the payment is made. 29 C.F.R. § 778.308. Overtime is also computed in terms of an hourly rate, so the compensation must be converted to an hourly rate. *Id.* ("The overtime rate, like the regular rate, is a rate per hour."). Calculation of the correct regular rate is the linchpin of the FLSA overtime requirement. *Hills v. Entergy Operations, Inc.*, 866 F.3d 610, 614 (5th Cir. 2017).

The FLSA does not exempt piece-rate pay from overtime pay requirements, and provides,

(g) Employment at piece rates

No employer shall be deemed to have violated subsection (a) by employing any employee for a workweek in excess of the maximum workweek applicable to such employee under such subsection if, pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work, the amount paid to the employee for the number of hours worked by him in such workweek in excess of the maximum workweek applicable to such employee under such subsection--

(1) in the case of an employee employed at piece rates, is computed at piece rates not less than one and one-half times the bona fide piece rates applicable to the same work when performed during nonovertime hours; or

(2) in the case of an employee performing two or more kinds of work for which different hourly or piece rates have been established, is computed at rates not less than one and one-half times such bona fide rates applicable to the same work when performed during nonovertime hours; or

(3) is computed at a rate not less than one and one-half times the rate established by such agreement or understanding as the basic rate to be used in computing overtime compensation thereunder: Provided, That the rate so established shall be authorized by regulation by the Administrator as being substantially equivalent to the average hourly earnings of the employee, exclusive of overtime premiums, in the particular work over a representative period of time;

and if (i) the employee's average hourly earnings for the workweek exclusive of payments described in paragraphs (1) through (7) of subsection (e) are not less than the minimum hourly rate required by applicable law, and (ii) extra overtime compensation is properly computed and paid on other forms of additional pay required to be included in computing the regular rate.

29 U.S.C. § 207(g). Thus, the FLSA requires an agreement or understanding arrived at between the employer and the employee before performance of the work and that the average hourly earnings for the workweek are at least the minimum wage and that overtime is properly computed. *Serrano v. Republic Servs., Inc.*, No. 2:14-CV-77, 2017 WL 2531918, at *9 (S.D. Tex. June 12, 2017) ("The Court reads this provision as requiring, when an employee works at a piece rate, some agreement or understanding regarding what the piece rate covers—and an overtime rate that does not fall below one and one-half times the resulting regular rate."). "In other words, the difficulty of quantifying an hourly rate when an employee is paid by the piece requires that the employer and employee anticipate inevitable delays and come to an agreement regarding how (not if) that

non-production time work is to be paid." *Id.*

For guidance on computing an employee's regular rate of pay, the DOL regulations provide "some examples" regarding the way in which to calculate this rate under particular compensation schemes. See 29 C.F.R. §§ 778.109–778.122. Section 778.111 governs pieceworkers:

> (a) Piece rates and supplements generally. When an employee is employed on a piece-rate basis, the regular hourly rate of pay is computed by adding together total earnings for the workweek from piece rates and all other sources (such as production bonuses) and any sums paid for waiting time or other hours worked (except statutory exclusions). This sum is then divided by the number of hours worked in the week for which such compensation was paid, to yield the pieceworker's "regular rate" for that week. For overtime work the pieceworker is entitled to be paid, in addition to the total weekly earnings at this regular rate for all hours worked, a sum equivalent to one-half this regular rate of pay multiplied by the number of hours worked in excess of 40 in the week. (For an alternative method of complying with the overtime requirements of the Act as far as pieceworkers are concerned, see § 778.418.) Only additional half-time pay is required in such cases where the employee has already received straight-time compensation at piece rates or by supplementary payments for all hours worked. . . .

The FLSA also requires an employer to compensate employees for nonproductive time worked. 29 C.F.R. § 778.318(a).   The FLSA provides:

> The situation described in paragraph (a) of this section [in which nonproductive hours must be counted and paid] is to be distinguished from one in which such nonproductive hours are properly counted as working time but no special hourly rate is assigned to such hours because it is understood by the parties that the other compensation received by the employee is intended to cover pay for such hours. For example, while it is not proper for an employer to agree with his pieceworkers that the hours spent in down-time (waiting for work) will not be paid for or will be neither paid for nor counted, *it is permissible for the parties to agree that the pay the employees will earn at piece rates is intended to compensate them for all hours worked, the productive as well as the nonproductive hours*. If this is the agreement of the parties, the regular rate of the pieceworker will be the rate determined by dividing the total piecework earnings by the total hours worked (both productive and nonproductive) in the workweek. Extra compensation (one-half the rate as so determined) would, of course, be due for each hour worked in excess of the applicable maximum hours standard.

46

29 C.F.R. § 778.318(c) (emphasis added).

Plaintiff alleges that the piece-rate compensation system under which he was paid violated the FLSA because it compensated him only for his productive time, *i.e.*, time spent picking up and delivering cans, but did not compensate him for certain tasks, which he characterizes as "non-productive" time, and that he did not agree that his piece rate compensation was intended to compensate him for both productive and unproductive time. However, Defendants contend that the compensation method described by § 778.318(c) was in place and agreed to.

The record demonstrates that the piece rate system was intended to compensate Plaintiff for both his productive and non-productive time. Def. Ex. D-2 (sealed) (assigning can values for hauls and other tasks); Whiteside depo. at 23 (when asked about unproductive time, "They're all built in with the can pay so any unproductive time is kind of built in to each can that's picked up. Q. So each can is – it's just understood that the can pay is – it takes into consideration things that are beyond the driver's control, like a truck breakdown or how much time they have to spend in the – in line at the dump? A. Correct."); *id.* at 90–91 (explaining that non-productive time was discussed at meetings but was not separately accounted for from productive time, and "was all built in with the can pay" and it was understood that every driver would have issues causing unproductive time); *id.* at 91 (discussing specific examples of nonproductive time, like a "false alarm" where the driver cannot get a can through no fault of their own, which is assigned a can value).

Although they were paid on the can rate, workers recorded all hours worked by clocking in and out and noting time off on their route sheets. Their pay was then determined by dividing their total can pay (their personal can rate by the total can values) by the total number of hours worked

(productive and nonproductive) to arrive at the regular rate, and they were than paid an additional 50% of that rate for overtime hours. This comports with § 778.318(c): "the regular rate of the pieceworker will be the rate determined by dividing the total piecework earnings by the total hours worked (both productive and nonproductive) in the workweek. Extra compensation (one-half the rate as so determined) would, of course, be due for each hour worked in excess of the applicable maximum hours standard." Defendants contend, and the record demonstrates, that Plaintiff's and other drivers' regular wages remained well above minimum wage.

Plaintiff does not dispute the way in which Defendant calculated his regular rate and overtime rate. Plaintiff's response disputes that he understood and agreed to the compensation scheme as required by the FLSA. Plaintiff disagrees that he understood the contours of the pay plan, and asserts that his constant complaints that he was not being paid correctly show he did not understand or agree. Plaintiff contends that the evidence shows that neither Lockhart nor Hankins, despite being long-term roll-off drivers, understood the pay scheme, and if they did not understand it, they could not agree to it. Plaintiff contends that his constant complaints that he was not being paid correctly, as well as the change in how cans were counted following the ROAD-EO, is evidence there was not an agreement.

In Plaintiff's Declaration submitted with his response, he states, "I never agreed that the can rate was supposed to reimburse me for both productive and non-productive time." Pl. Decl. ¶ 10. Plaintiff also points to the testimony of Hankins, another roll off driver for Republic, to show that workers did not understand the compensation scheme. Hankins testified that they tried to follow the piece of paper assigning can values, but then checks would be lower than expected because can values were adjusted downward by the supervisor. Hankins depo. at 39. Hankins

48

testified that the confusion about how he was paid really "came to light" when he was buying his house because the bank giving his loan could not understand how he got paid. *Id.* at 41. Although not entirely clear, he also appears to testify that employees did not understand how overtime pay was calculated. *Id.* at 41-42.

Courts have found that summary judgment is not appropriate when there is a genuine dispute about the existence of an agreement that workers' piece-rate compensation is intended to compensate them for all productive and nonproductive work. *Thompson v. Capstone Logistics, LLC*, No. 4:15-CV-2464, 2018 WL 560407, at *5 (S.D. Tex. Jan. 25, 2018) (listing cases); *Id.* ("If the facts show that Plaintiffs agreed that their [nonproductive] time would be counted but not independently paid, 29 C.F.R. § 778.318(c) applies and Defendants' method of calculating the regular hourly wage and overtime wage is correct. If the facts show that no such understanding existed, 29 C.F.R. § 778.318(b) may apply instead.").

Defendants contend that Plaintiff's statement that he never agreed that his piece-rate compensation would include non-productive time was not made until after the close of discovery and after reading Defendant's motion, and thus should not be permitted to create a fact issue in light of the other evidence.[17] Ramzinski testified that he discussed the pay plan with Plaintiff on numerous occasions, and explained that the can rate was intended to compensate him for all time worked. Def. Ex. D (Ramzinski Decl.) ¶ 19).[18] Ramzinski states Lockhart continued working after

---

[17] Defendants point to Plaintiff's offer letter. Plaintiff's offer letter, which he signed, explained that he would be paid a day rate of $19.50 and a personal can rate of $14.50. Def. Ex. E. However, it does not state what the can rate was intended to compensate, or that it was intended to compensate all unproductive time. Although Plaintiff admitted to being paid a can rate, that does not decide the issue. *Thompson v. Capstone Logistics*, No. 4:15-CV-2464, 2018 WL 560407, at *4 n.5 ("Defendants argue that summary judgment is appropriate on this issue because Plaintiffs "admit" to being paid on a production or piece-rate basis. However, there can still be a question of fact as to whether the rule in 29 C.F.R. § 778.318(c) applies to this particular situation; just because Plaintiffs acknowledge they are paid on a piece-rate basis does not automatically clear up confusion about how their "regular rate" is calculated.").

[18] Whiteside also testified that "We had a pay plan that Ricky was very aware of, right, signed off on." Whiteside

acknowledging the pay plan and repeatedly demonstrated an understanding that the can rate compensated him for all hours worked. *Id.* Moreover, Defendants contend, Plaintiff never complained about the fact that the can pay did not compensate for nonproductive time or assert that he did not agree to such a scheme, and he testified that he was happy with the pay after they increased the value of certain cans, but he was still paid a piece rate after the increase, the same as before.

Courts have held that an agreement need not be in writing, but may be inferred from the parties' conduct. *Espenscheid v. DirectSat USA, LLC*, No. 09-cv-625-bbc, 2011 WL 10069108, at *29 (W.D. Wis. Apr. 11, 2011). Plaintiff's testimony confirmed his understanding that he was paid "just on the can rate." Pl. depo. at 48-49. Workers did not separate productive and non-productive time on their route sheets. Hankins depo. at 76. Plaintiff was paid on the piece-rate system for many years, turning in his route sheets with his can pay and clocking in and out his total hours. He accepted paychecks based on the calculation of his total can pay divided by his total hours, with no separate consideration of productive and non-productive time. It is reasonable to infer from this conduct that he understood that the piece-rate covered both his productive and nonproductive work. 2011 WL 10069108, at *30.

In *Espenscheid*, the court nevertheless found a fact issue because several plaintiffs testified that they were not sure how their pay was calculated and that they complained to supervisors about not being for nonproductive tasks and the employer had an ambiguous handbook stating that an employee's "pay plan will consist of some type of productivity, quality or piecework component." *Id.* at 29. The workers in *Serrano* offered testimony that no one ever explained to them that the

---

depo. at 20; *id.* at 21 ("We have a play plan and all the drivers sign off that they understand what the pay plan is."). However, Whiteside did not know if the plan specifically covered productive versus unproductive time. *Id.* at 21-22, 24.

zone rates included any non-production time,[19] that they considered their pay to be based on what they have to do to earn it – what it takes to get a landfill ticket on which the zone rate is earned – and when they encountered a lot of down time, they would complain to their supervisors. *Serrano*, 2017 WL 2531918, at *7. Further, the *Serrano* court found there was no meeting of the minds because (1) Republic did not share all of the terms of the pay plan with the drivers and it was not fully explained to them as it did not expressly address non-production time, (2) Republic did not apply the pay plan terms as written, and (3) Republic had no consistent position on whether there was an agreement with the employees with respect to the treatment of non-production time (offering at least five different positions). *Id.* at 10-11.

Moreover, Republic's General Manager "denied ever meeting with drivers and explaining the zone rate's inclusion of any non-production time." *Id.* at 11. When the drivers complained, they were not told their down time was included in the zone rates or contingent day rates, but were instead told to write it down and a supervisor would take care of them or they should discuss it with management, which implied a promise of additional compensation or at least that the matter was up for negotiation rather than a pay structure that was set and agreed to. *Id.* In *Arnold v. DirecTV, LLC*, No 4:10-CV-352 JAR, 2017 WL 1196428 (E.D. Mo. Mar. 31, 2017), the plaintiffs survived summary judgment by providing testimony that they were not paid for nonproductive time spent in meetings, performing inventory, driving between jobs, calling customers, completing paperwork, and organizing her company provided-van, not paid for certain tasks they were required to do, and had to wait at a customer's house without being paid for it. That type of testimony is lacking here.

Here, we have no testimony from any witness that they did not understand that the piece

---

19  The nonproduction time included: down time due to mechanical breakdowns and flat tires; DOT paperwork, inspections, and attending meetings; stock searching; security clearances; and excessive wait times or diversions associated with refueling, landfill lines, and customer issues. *Serrano*, 2017 WL 2531918, at *13.

rate system was compensating them for all hours worked, both productive and unproductive time, nor do we have complaints to employers about not being paid for nonproductive time or any ambiguous or confusing statements from the employer. We have only Plaintiff's testimony that he did not understand how to correctly value certain cans (as swap versus dump and return), that Hankins' bank did not understand how he was paid, and that some employees did not understand how overtime was calculated.

Plaintiff's reliance on his complaints about pay and his professed confusion about the pay plan do not demonstrate that he did not agree that the piece rate system would compensate him for all his time, both productive and nonproductive. Ramzinski explained the pay policy. He explained that a can value was determined based on distance from the landfill and whether it is a swap (two legs) or dump and return (three legs). Ramzinski depo. at 24. He said that when a driver initiated a swap, he brought an empty container, swapped the empty container for the customer's full one, then took the full one to the landfill. This generally required two legs – one trip to the customer to get the container and one trip the landfill, and then the haul was complete. Ramzinski depo. at 17. However, sometimes the driver was required to return the customer's container rather than swap it with a different container, and thus this trip was assigned three legs – one trip to the customer to get the container (whether an open top or a compactor), one trip to the landfill to dump it, and one trip to return the container to the customer. Ramzinski depo. at 17. Thus, if the haul required two legs, Ramzinski classified it as a swap, and if the haul required three legs, he classified it as a dump and return. The pay plan then assigns can pay for each grid based on whether it's a dump and return or a swap and to which landfill it goes. Ramzinski depo. at 18.

Plaintiff's Declaration agrees that the value of a can depended on "how far away they are

from the landfill, [and] also how hard they are to service." Pl. Decl. ¶ 9. He stated that compactors are more time consuming to service than regular "open top" boxes and dump and returns take more time than simply swapping out a full can for an empty can. *Id.* ¶ 10. He states that when he was complaining "about how to count such cans and trying to get them to see it my way, I was complaining not only of my straight-time rate but my overtime rate since both rates of pay necessarily depended on how much a given can was worth and how much productive time it took me to service them." *Id.* He states that, if he had instead been paid a flat hourly rate, he would not have cared what cans were worth. *Id.* ¶ 11. He felt Ramzinski and Whiteside were trying to cheat drivers out of the higher pay per can. ¶ 14.

Ramzinski correctly states that Plaintiff's complaints were not about being paid a piece rate or being paid improperly under the FLSA (such as by not being paid for nonproductive time), but the about the value (can rate) for certain types of hauls and how that affected his overall wages (regular rate and overtime rate). Def. Ex. D ¶ 20. Ramzinski characterized Plaintiff's complaint as being that all compactors should be classified as a dump and return, but that Ramzinski had to explain it to him "you have to count the legs." Ramzinski at 25. He testified, "It's all about how many trips you're making to the customer to complete the haul. [S]o he was at one location or pretty much one location [the HEB warehouse] for the day, for most of the day. So the first can to get there would be paid as a dump and return, but every subsequent can at the same location would be considered a swap because you're only making two legs. He wanted to be paid three legs for each one, even though he wasn't making three legs on each one so – and at the time that current pay plan didn't allow for that so, you know, I under stood that he didn't like it, but that was – it was

consistent with what the pay plan was." Ramzinski depo. at 26.20

Ramzinski stated that in his conversations with Plaintiff, Plaintiff told him he disagreed with Ramzinski's application of the pay plan. Ramzinski depo. at 60. Ramzinski told him he knew he disagreed with it, but he had to comply with the approved plan, even while there were discussions about changing it in response to Plaintiff's concerns. Ramzinski depo. at 61. Ramzinski stated that the can values were very clear on the grid spreadsheet and "[t]here's really no gray area." *Id.* at 62. Plaintiff's issue was whether certain cans were considered a dump and return versus a swap, but Ramzinski communicated how the plan worked "to every driver and to Ricky several times during all these discussions." Ramzinski depo. at 63. Ramzinski thought the issue was easy to understand and that "anyone given the responsibility of driving a 60000-pound truck can understand two legs versus three legs so you only got to be able to count to three in order to understand it." Ramzinski depo. at 66. Ramzinski said that Plaintiff was "not the only one that didn't like it, but he's the only one that said he didn't understand it." *Id.* Ramzinski felt that Plaintiff did understand it, he just disagreed with it. Ramzinski depo. at 93.

Plaintiff's testimony on this issue is as follows:

> I asked him about this box and he was saying something about three legs and dump and return and an open top and the problem I was having is defining an open top and compactor, the compactor, the one you've got to turn around majority of them and an open top and they was telling me that I'm in the same area and I was telling them, well, it's five or six miles in between and so I think Kenny tried to explain one leg, two legs, three leg, but a definition of a dump and return he didn't really explain it. Well, in a sense he did because a dump and return is when you've got to bring it back to the customer. A swap is when you finish it. Once you get the landfill, you complete it. You close it out. You go to the next customer. If any kind of dump and return, you've got to take it back to the customer.

---

20 He also testified that you could classify either the first or last can as a dump and return, but all subsequent hauls at the same location, "unless you had to go to a totally different place in the middle of y'all route, all subsequent hauls would be two legs and therefore would be considered a swap." Ramzinski depo. at 62-63.

Q. And that's why you say it's three legs?

A. I said that's what he said it's three legs. If he want to put it three legs, I guess you're saying, he's saying I've got to go back. Okay. If I have to go back, I drop that box off, I still got to go to the next box so I was saying, well, I've got to go do this box. It's three, four miles over; that's one leg. I've got to go to the landfill, that's two legs. I've got to bring it back, the third leg where he was saying you finish it, so he was telling me I'm there, I've got to go get another one, so he wasn't counting that leg so it's impossible. Once you get one, I guess, the way he was explaining it three legs is a dump and return. I would say that's true, a dump and return, so that's why I was telling him. Now I've got to go two or three miles to get that one. That's one leg. I've got to go get it. It ain't going to jump on my box. I've got to go get it so I go get it; I go dump it and then I bring it back, and the problem all of this escalate I was having problems because I was looking – that's the only way, okay, great we weren't getting paid by the hour. I heard they is now. I wouldn't have no problem so I'm trying to grade my pay the way I see it just like I think everybody in this room.

. . .

A. It's all right. Well, that's the problem I was having and it was escalating and the way it was saying how to retaliating, I guess they wanted me to do it their way. I went so far and say this is three legs, you know, because I've got to go get that box. I went so far to say, well, if y'all are taking a cut out of may pay, if they're taking a cut out of the company pay. Whatever I was making [for the] company I could care less. I was concerned about what I supposed to get pay and that's the only thing I was concerned about.

Plaintiff testified that there was a meeting with HR and "Kenny got upon the board trying to explain it and none of the drivers off in there could understand it the way he was explaining it, just like I explain it. If he's going by three legs, the only thing I was just classifying a dump and return is a dump and return in which that's what it is." Pl. depo. at 36-37. Thus, if Plaintiff is at the customer location, such as the HEB warehouse, and went to dump and return the box, he felt it should be counted as a dump and return, rather than a swap, especially since he had to travel a distance from the just-serviced container to the next. *See* Pl. depo. at 89 ("my big complaint was about the one that I had to turn around, they was not paying for me it. . . . They were paying me, I understood, like an open top. They were paying me for a swap when actually I would dump and

return it.").

Accordingly, the issue is whether Plaintiff's alleged confusion and/or disagreement about how certain cans were valued under the pay plan means that Plaintiff did not agree to the plan for purposes of FLSA compliance. The Court finds that it does not. Although Plaintiff thought he should have been paid a higher can value for certain hauls, he has not shown that he did not agree to the overall structure of the pay plan, including that his paycheck (based on his personal can rate multiplied by the total number of cans) was intended to compensate him for all the hours he worked, both productive and unproductive.

Plaintiff never indicated his disagreement during the events in question, in his Complaint, or in discovery. His Complaint has always alleged only that, by changing the value of the can rates, that changes his regular rate for the week, and by extension his overtime rate. First Am. Compl. ¶ 38-39; Second Am. Compl. ¶ 38-39. His Complaint acknowledges that the piece rate system pays him for all hours worked according to clock-in/clock-out times. First Am. Compl. ¶ 38; Second Am. Compl. ¶ 38. It alleges that he was not separately compensated for non-productive time, but Defendants based payment on estimates of what non-productive time would be. Second Am. Compl. ¶ 112. Plaintiff never alleged, complained, or testified that he did not agree to such a system, other than his one statement in his Declaration in response to Defendants' motion for summary judgment. And his conduct during his years at Republic indicates that he both understood and accepted the pay plan insofar as it was intended to compensate him for both productive and nonproductive time. Accordingly, the Court finds that there was an agreement under 29 C.F.R. § 778.318(c) and that Defendants properly calculated Plaintiff's pay thereunder.

2. Mandatory Meal Break Deductions

Plaintiff alleges that Defendants have a policy that requires drivers to take a 30-minute meal period each day and would deduct 30 minutes from class members' on-the-clock hours, even though they knew drivers regularly worked through their 30-minute meal periods. Am. Compl. ¶ 117-18. Plaintiff alleges that Defendants could know where drivers where during their supposed lunch breaks, including knowing whether they were in motion at the time they were supposedly on a break. *Id.* ¶ 120. Because Plaintiff often worked through his lunch break, Plaintiff complains that he was not paid for time worked and that Defendants kept inaccurate records.

It is undisputed that Defendants had a policy, based on a DOT requirement, that drivers who worked more than an 8-hour shift were required to take a 30-minute lunch break and were to record this time on their route sheets as off duty. During their lunch break, they were relieved of responsibility for their truck and were free to leave the truck area and pursue activities of their choosing, and were not performing duties for the benefit of the employer, and thus it was properly denominated as non-compensable time. Drivers were told not to record the meal period as off-duty if it did not meet the conditions stated (vehicle parked, at least 30 minutes, relieved from responsibility for truck, free to leave and pursue activities of their own choosing). In accordance with the mandatory requirement to take a 30-minute off-duty lunch, drivers were to note their lunch break on their time sheets each day that they drove more than eight hours (which was most days), and the 30-minute meal break was deducted from their total hours on the clock (drivers did not clock out and then back in for lunch).

Defendants correctly contend that automatic meal deductions are not a per se violation of the FLSA. *See Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313, 320–

21 (E.D.N.Y. 2014) (noting that "automatic meal deduction policies are not per se illegal" and collecting cases); *Walker v. Health & Hosp. Corp. of Marion Cty.*, No. 1:15-cv-01978-JMS-TAB, 2016 WL 7179370, at *10 (S.D. Ind. Dec. 9, 2016) ("Automatically deducting thirty minutes for a meal break is not a per se violation of the FLSA."); *Cason v. Vibra Healthcare*, No. 10-10642, 2011 WL 1659381, at *3 (E.D. Mich. May 3, 2011) ("the use of an automatic meal break deduction, in itself, does not violate the FLSA"). An employer's timekeeping policies are legal as long as they allow for the complete and accurate recording of all time worked. *Desilva*, 27 F. Supp. 3d at 321. The policy would provide for complete and accurate recording of all time worked if drivers took the mandatory meal breaks each day they worked for more than 8 hours, as they were required to do, or if they were able to adjust the time sheets and get paid for the time worked on days they were unable to take the required lunch break.

"'An employer who is armed with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation.'" *Harvill v. Westward Comms. LLC*, 433 F.3d 428, 441 (5th Cir. 2005). "[I]f the 'employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of § 207.'" *Id.* In other words, an employer cannot be held liable for FLSA violations unless it has actual or constructive knowledge of an employee's overtime work. *Boelk v. AT&T Teleholdings, Inc.*, 2013 WL 3777251, * 6 (W.D. Wis. 2013).

An employee must demonstrate that he has performed work for which he alleges he was not compensated and produce sufficient evidence to show the amount and extent of that work as a

matter of just and reasonable inference. *Harvill*, 433 F.3d at 441. Thus, the relevant inquiries are (1) whether Plaintiff performed work for which he was not paid overtime compensation; (2) whether Defendants knew or should have known that Plaintiff was working through meal breaks or taking shorter meal breaks than required and failed to compensate him for overtime appropriately; and (3) whether Plaintiff can establish the amount and extent of that work as a matter of just and reasonable inference.

Plaintiff testified that he sometimes took a shorter lunch period and that Defendants instructed them to note lunch on their route sheets whether they took a 30-minute lunch or not. He testified as follows:

> *Q. How often did you take your mandatory lunch break?*
>
> *A. Not hardly, never. Like I said, I get 10 or 15 minutes and I carry on.*
>
> Q. Did you understand that you were violating company policy by not taking your mandatory 30-minute lunch break?
>
> A. Well, I understood *they said we was -- had -- required we had to note if we take it or not, we had to note 30 minutes down and so that's why I said put something down.* That's why I put 10 to 10:30 down so that was it until -- I didn't have no problem until they told me to put "lunch" down, l-u-n-c-h.
>
> Q. Did you understand that when you were representing that you took a lunch but you really didn't take a lunch, that you were violating company policy?
>
> A. No, I was just trying to get production, that's all, you know.
>
> Q. Did you understand when you indicated that you took a lunch when you really didn't that you were violating the Department of Transportation regulations?
>
> A. No. Like I said, my 15 minutes was like the 30-minute because I took like the break and they told me to show something.
>
> …
> Q. How often did you violate the Department of Transportation regulation requiring that 30-minute lunch break?

A. Well, when I took a 30-minute so, like I said, when I took a 30-minute, sometimes I didn't so I don't know, like 15, 20 minutes sometimes, and sometimes I didn't.

Q. How many days in a typical week did you violate the D.O.T. regulation by not taking your lunch break?

A. I wouldn't know because they were saying that show the 30-minute lunch break, and that's what I was doing.

Q. You didn't keep any other records?

A. No, ma'am.

Q. So we don't really have any way of knowing how many times you violated that D.O.T. regulation, right?

A. Right.

Q. You don't even have a guess?

A. No, ma'am.

Q. Was anybody at Republic or BFI or Allied, whatever you want to consider it, aware of the fact that you were violating that D.O.T. violation?

A. *Well, I think when they wrote me up, they told me that I think a 30-minute show, even if I didn't take it so it required that we've got to put it on the paper, even though if y'all ain't taking it so that's why I just try to get production and taking it when I could and taking it, yes, ma'am.*

Q. Did anybody, any of the companies, know that you remember not taking your lunch break?

A. Well, evidently, they had to know because they told me that -- that put something down, and the 30-minute that I was putting from 10 to 10:30, that I had to note that I'm putting -- required to put 30 minutes down.

Q. Right, but did anybody know whether you were being truthful in that or not?

A. Well, they see my route sheet every day, and they said they were going over it.

Q. But did they know that you weren't being honest on that route sheet?

60

A. So I wouldn't know that because, like I said, sometimes I took 30 minutes and sometimes I didn't.

Q. Did you ever make any complaints to anyone at the company or through The Aware Line that you were working off the clock?

A. No.

Q. Did you receive training on the mandatory 30-minute meal period?

A. Training, no more than the form that they gave me and that was it. As far as the training that we got to stop and shut down on the 30 minutes, no, they never did demand that, give me that or follow up to what I was doing. I understood what they're doing now is they're shutting everybody down and making them, but back then when I was driving, no, they were not.

Pl. depo. at 79-85 (emphasis added).[21] Juan Puga also testified that showing lunch "was mandatory. You had to put down that you took it whether you did or didn't" and that was understood by and enforced by Ramzinski. Puga depo. at 103-104.

The Court finds that there are material fact issues as to whether Defendants knew that Plaintiff did not always take 30-minute meal breaks but still recorded the lunch on his route sheets. However, the Court agrees that Plaintiff has not adequately shown the amount and extent of hours worked to a just and reasonable certainty. Plaintiff did not even "have a guess" as to how many times he did not take a full 30-minute lunch. To address Defendant's argument, Plaintiff states that he testified that he did not take his lunch breaks ("Q. How often did you take your mandatory lunch break? A. Not hardly, never. Like I said, I get 10 or 15 minutes and I carry on.") and thus the amount of uncompensated time could be determined by payroll records showing what days Plaintiff worked (and hence days he did not take a lunch break). Plaintiff states that he could rely

_____

21 Defendants contend they are entitled to summary judgment because Plaintiff denied, under oath, that he performed any work off the clock. Pl. depo. at 79 ("Q: Did anyone ever ask you to work off the clock? A: No. Q: Did you ever decide on your own to work off the clock? A: No."). However, he also clearly testified that he worked through his lunch break and/or did not take the full 30 minutes sometimes, and the 30 minutes was deducted regardless.

on the totality of his pay records to present evidence for each week that would show much he should have been paid had he been paid correctly.

However, Plaintiff's position that missed lunch times could be applied to each day he worked ignores Plaintiff's deposition testimony that "sometimes I did and sometimes I didn't" take the required 30-minute lunch break and he had no way of knowing how many times this occurred.[22] Further, he testified vaguely, "when I took a 30-minute so, like I said, when I took a 30-minute, sometimes I didn't so I don't know, like 15, 20 minutes sometimes, and sometimes I didn't." His testimony indicates he often took a 10, 15, or 20 minute lunch, rather than no lunch, and it is impossible to know if he took 10, 15, or 20 minutes on any given day. Thus, any estimate necessarily would be speculative. *See Ihegword v. Harris Cty. Hosp. Dist*., 929 F. Supp. 2d 635, 668 (S.D. Tex. 2013) ("[A]n unsubstantiated and speculative estimate of uncompensated overtime does not constitute evidence sufficient to show the amount and extent of that work as a matter of just and reasonable inference."); *Faery v. Weigand-Omega Mgmt., Inc.*, No. H-11-2519, 2012 WL 3063899, at *3 (S.D. Tex. July 26, 2012) (granting summary judgment for employer when plaintiffs testified they could not estimate how many overtime hours they worked). Plaintiff fails to meet his burden of demonstrating hours worked without compensation as a matter of just and reasonable inference.

3. Retaliation

The FLSA provides that it is unlawful for any person to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to

---

22 He testified that he never reported incorrect time on the DOT logs, which he was required to file three or more times a week, which indicates that he was correctly noting his lunches those days.

testify in any such proceeding . . . ." 29 U.S.C. § 215(a)(3). Defendants seek summary judgment on the issue of whether Plaintiff engaged in protected activity.

Plaintiff's claim "turns on whether or not his behavior constitutes filing a complaint under Section 215(a)(3)." *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 623 (5th Cir. 2008). The Supreme Court has held that oral complaints may be protected activity. *Kasten v. Saint-Gobain Perf. Plastics Corp.*, 563 U.S. 1 (2011). However, "the employer must have fair notice that an employee is making a complaint that could subject the employer to a later claim of retaliation" such that it "must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Id.* Even an informal, internal complaint may constitute protected activity. *Hagan*, 529 F.3d at 625. But not all "abstract grumbling" or "vague expressions of discontent are actionable as complaints. *Id.* The informal complaint must concern some violation of law. *Id.* This means that while a plaintiff need not explicitly refer to the FLSA statute, the complaint must be framed in terms of potential illegality. *Lasater v. Tex. A&M Univ.-Commerce*, 495 F. App'x 458 (5th Cir. 2012); *Santos v. Wincor Nixdorf, Inc.*, No. 1:16-CV-440-RP, 2018 WL 1463710, at *5 (W.D. Tex. Mar. 23, 2018), *aff'd* 778 F. App'x 300 (5th Cir. 2019).

Thus, where an employee voiced objections and concerns to management about the possibility of field technicians receiving less overtime pay after a schedule change, without framing any objections in terms of potential illegality, the objections were found to not be protected activity in *Hagan*. Further, complaints that one is entitled to higher pay -- without attributing the current pay to or putting the employer on notice of potential illegality -- will not establish protected activity. Unless the employee complains they are not being paid enough *and*

the specifics and context of the complaint are sufficient to put the employer on notice that the employee felt they were not being paid the minimum wage or appropriate overtime wages, the complaint about wages will not be protected. *See, e.g.*, *Vallejo v. N. E. Indep. Sch. Dist.*, No. SA–12–CA–270–XR, 2013 WL 3050484, at *7 (W.D. Tex. June 17, 2013) ("Although Vallejo did not phrase his complaint in terms of a potential FLSA violation, from the record it is evident that Vallejo was clear in his communication that he was concerned with the nonpayment of his alleged overtime and that he believed Mr. Jackson was altering Vallejo's timecard inappropriately. By confronting Mr. Jackson on numerous occasions and speaking to payroll management, Vallejo adequately put NEISD on notice that he was concerned with his rights to receive compensation for the time that he had actually worked."); *Alvarez v. Amb–Trans Inc.*, No. SA–11–CV–179–XR, 2012 WL 4103876, at *3 (W.D. Tex. Sept. 17, 2012) ("Specifically, Alvarez alleges that he told his manager that he was not getting paid the full amount of overtime that he was supposed to receive, and that the amount of hours for which was supposed to be getting paid were not accurate. Since Alvarez's statement was to a supervisor in the company and regarded improper payment, his statement would constitute protected activity under the FLSA.... Crist says he complained that he was not receiving pay for days that he came into work on scheduled days off. Again, since Crist's statements were to a supervisor and concerned improper payments, his complaints would constitute protected activity.") (citations omitted); *Archibald v. Mexia Indep. Sch. Dist.*, No. W-09-CA-154, 2010 WL 11598129, at *3 (W.D. Tex. Feb. 19, 2010) (complaint that defendant was intentionally refusing to pay overtime was sufficient).

According to the Complaint, Plaintiff "related to Beasley how neither he--nor other similarly situated drivers in San Antonio–were being given proper monetary credit for servicing

the containers with which they were tasked." Docket no. 30 ¶ 33. He also testified that he called the company's Aware Line "about the box pay." Pl. depo. at 62. Plaintiff testified that Ramzinski retaliated against him because "we were back and forth with the box pay." Pl. depo. at 32; *id.* at 36 (agreeing that Ramzinski retaliated against him because of the complaint he made about box pay). Plaintiff testified he was complaining to Rueles once or twice a week because he was not making the money he was supposed to be making and Rueles was adjusting his pay by reducing his box count. *Id.* at 32, 38. As discussed in detail above, Plaintiff's complaint focused on whether certain cans should be valued as a swap (two legs) or a dump and return (3 legs), wherein a dump and return was given a higher value. Plaintiff testified that Rick Henderson told him he needed to quit complaining and shut up about it because he was making a lot of money. *Id.* at 35-36.

Ramzinski states that Plaintiff never complained to him that he believed his overtime was incorrectly calculated. Def. Ex. D (Ramzinski Decl.). Ramzinski states that Plaintiff's complaints were about the value of certain types of hauls, not about being paid a piece rate or being improperly paid under the FLSA or any other law. Def. Ex. D (Ramzinski Decl.). Ramzinski contends that he "had no knowledge or understanding that Mr. Lockhart complained about violations of the FLSA or any other law." *Id.*

Similarly, Whiteside states, "Mr. Lockhart never complained to me that he believed his overtime was incorrectly calculated. His complaints to me were about the value of his hauls and having the discretion to determine how to most efficiently handle his route, not about being paid a piece rate or being paid improperly under the Fair Labor Standards Act or any other law." Def. Ex. N. He also states, "I had no knowledge or understanding that Mr. Lockhart complained about violations of the FLSA or any other law." *Id.*; *see also* Whiteside depo. at 163 (he understood

Plaintiff made complaints about the way in which he was paid but he did not complain about the pay practices being in violation of any law, and Whiteside did not understand that the pay practices were in violation of any law, including the FLSA). Whiteside testified that Plaintiff specifically told him that the issue was being paid on dump and returns versus swaps, and in the old system if it was listed as a swap, the driver had to swap it, even if it made more sense to do a fast dump and return on it, and Plaintiff taught him that he should be able to trust good drivers on making good decision in the field because it benefits them too. Whiteside depo. at 166. Whiteside said that Plaintiff never complained about the way his overtime pay was calculated. *Id.* at 173.

Plaintiff contends that "it strains credulity to claim that neither Lockhart nor the Defendants appreciated that his complaints were more than just a disagreement over pay, and did not directly implicate the violation of overtime laws" given the record from Lockhart and other witnesses, including "the almost contemporaneous and similar issues being litigated in *Serrano* about which Lockhart testifies being invited to join but not joining due to fear of retaliation." Docket no. 43 ¶ 89. Plaintiff contends that his complaints about the value of cans under the piece rate system were necessarily complaints about overtime because the regular rate, and therefore the overtime rate, was a product of the total value of all cans serviced in a given week divided by the number of hours needed to service them. Plaintiff argues that, had he been paid an hourly rate, he would not have cared about how cans were valued, because his regular and overtime rates would have been a set amount. Docket no. 43 at 7 (citing Lockhart Decl. ¶ 10). Once Lockhart's complaints were heeded, his effective rate of pay increased by $4/hour. Further, Plaintiff argues that he complained of pay practices that were the subject of extensive litigation in the *Serrano* FLSA litigation. Plaintiff contends that the fact that he didn't recite the FLSA regulations by

chapter and section does not change the fact that shortly after making those pay complaints in Arizona he was disciplined and ultimately terminated by the same managers about whom he was complaining were not paying him right.

Plaintiff did not complain about a violation of the law, nor did his complaints provide fair notice to Defendants of a potential FLSA issue, since Plaintiff was still receiving minimum wage and was being paid for all hours worked under the plan.[23] He did not express concerns that he was not receiving minimum wage or overtime pay, that he was not being paid for nonproductive time, or that his overtime wages were being improperly calculated. Plaintiff's complaints were "simply an expression of disagreement about [] policy and not a complaint of illegality." *Lasater*, 495 F. App'x at 463. Plaintiff complained that he should be getting paid more for some containers, which ultimately affected his straight pay and thus his overtime pay amounts, but that is true in all cases where an employee complains that they are not getting paid enough. As long as the complaints do not indicate to a reasonable employer that they implicate minimum wage or overtime requirements of the FLSA, they are not protected activity for purposes of FLSA retaliation. Whiteside and Ramzinski both testified that they were unaware of the specific complaints being litigated in *Serrano*, and the fact that other wage and hour litigation was ongoing in the Southern District was not enough to put them on notice that Plaintiff was somehow invoking the FLSA. The Court finds that Plaintiff's complaints about pay were not protected activity for FLSA purposes.

## Conclusion

Defendants' Motion for Summary Judgment (docket no. 35) is GRANTED. Plaintiff shall take nothing by his claims and his claims are DISMISSED WITH PREJUDICE. The Clerk shall

---

23 Plaintiff admits that, both before and after the pay policy change in May 2017, he was making well above minimum wage. *See* docket no. 43 at 8 (before the pay change, his 13-week average for his straight-time rate was $26.09 and his overtime $40.14; after the pay change, his straight-time rate was $31.00 and his overtime $46.50).

enter Judgment pursuant to Rule 58 and shall CLOSE this case.

It is so ORDERED.

SIGNED this 8th day of May, 2020.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE